[No. S055684. Aug. 10, 1998.]

HOWARD R. BROADMAN, a Judge of the Superior Court, Petitioner, v. COMMISSION ON JUDICIAL PERFORMANCE, Respondent.

COUNSEL

Lewis, D'Amato, Brisbois & Bisgaard, James E. Friedhofer, McCormick, Barstow, Sheppard, Wayte & Carruth, Stephen R. Cornwell and Gregroy S. Mason for Petitioner.

Stephen R. Barnett and J. Clark Kelso for California Judges Association as Amicus Curiae on behalf of Petitioner.

John Shepard Wiley, Jr., and Dennis F. Coupe for Respondent.

OPINION

**THE COURT.**—A judge may be disciplined for (1) willful misconduct in office, (2) persistent failure or inability to perform judicial duties, (3) habitual intemperance in the use of intoxicants or drugs, or (4) conduct prejudicial to the administration of justice that brings the judicial office into disrepute. (Cal. Const., art. VI, § 18, subd. (d) [former subd. (c)].) The discipline can be private or public admonishment, censure, or removal from office. (*Ibid.*)

Based on evidence presented at a public hearing before three special masters appointed by this court, the Commission on Judicial Performance (hereafter the Commission) determined that Judge Howard R. Broadman of the Tulare County Superior Court had engaged in conduct prejudicial to the administration of justice that brings the judicial office into disrepute (hereafter prejudicial conduct). The Commission's recommended discipline is public censure. Judge Broadman has petitioned this court to modify or reject the Commission's recommendation.

We conclude that Judge Broadman (hereafter petitioner) engaged in willful misconduct in office and in prejudicial conduct. We adopt the Commission's recommendation of public censure.

## I. PROCEDURAL BACKGROUND

The Commission's third amended notice of formal proceedings, the operative pleading in this matter, charged petitioner with both willful misconduct in office and prejudicial conduct. It contained three counts. Count 1 alleged that petitioner abdicated his "duty to respect and comply with the law by taking judicial actions in knowing or reckless disregard of constitutional and other mandates." Count 2 charged that petitioner publicly commented on pending cases in violation of the Code of Judicial Conduct and

used the news media as a forum to defend his judicial actions. Count 3 alleged that in matters involving Attorney Arthur Kralowec petitioner failed to conduct himself "in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

On June 14, 1995, at the request of the Commission, this court appointed three special masters whom the Commission had selected from a list provided by this court. (Cal. Rules of Court, former rule 907.)[1] The special masters were Superior Court Judges Spurgeon Avakian (retired) and Jay Pfotenhauer (retired), and Municipal Court Judge Jane York. After 27 days of evidentiary hearings, Special Masters Avakian and Pfotenhauer filed a majority report with the Commission, while Special Master York filed a concurring and dissenting report. As to the charges relevant here, Special Masters Avakian and Pfotenhauer concluded that petitioner had engaged in willful misconduct and prejudicial conduct by the manner in which he induced a criminal defendant and his counsel to waive time for sentencing, in prejudicial conduct by publicly commenting on pending cases, and in willful misconduct and prejudicial conduct in matters involving Attorney Arthur Kralowec. Special Master York, on the other hand, concluded that petitioner's actions were prejudicial conduct as to all of the charges relevant here. The special masters made no recommendation as to the appropriate discipline.

The Commission, after hearing oral argument, determined that the record established by clear and convincing evidence that petitioner had engaged in prejudicial conduct by: (1) inducing a criminal defendant and his counsel to waive time for sentencing without disclosing the purpose, (2) publicly commenting on two pending cases, and (3) attempting to influence the outcome of a civil action against Attorney Arthur Kralowec while it was pending before another superior court judge. The Commission recommends public censure.

## II. Threshold Issues

Petitioner raises several issues concerning the scope of this court's authority to review the Commission's recommendations, the standard of proof the Commission must satisfy to sustain its charges, and, together with his amicus curiae, the California Judges Association (hereafter the CJA), the perceived ambiguity in this court's definition of willful misconduct in office. We address these threshold questions before discussing the facts underlying the charges and the issues related to them.

---

[1]Effective December 1, 1996, a number of the California Rules of Court relating to judicial discipline were repealed. Unless otherwise indicated, citations to the rules are to the version of the rules applicable at the time of the relevant events or proceedings.

A. *This Court's Authority*

Petitioner argues that the state Constitution limits the scope of this court's role in reviewing Commission recommendations in two related respects. First, he asserts that when the Commission finds that a judge committed an improper act, and that the act was prejudicial conduct but not willful misconduct, our task is simply to determine whether the judge committed the act in question and whether the act amounted to prejudicial conduct. We may not, he claims, find that the act constituted willful misconduct. Second, he contends that when the Commission has recommended that this court impose a particular type of discipline, in this case public censure, we may either adopt the recommendation or we may absolve the judge, but we may not impose a discipline more severe than that recommended. We reject both contentions.

Former subdivision (c) of article VI, section 18, of the California Constitution provided that on "recommendation of the Commission," this court has jurisdiction to "censure or remove a judge for action . . . that constitutes willful misconduct in office . . . or conduct prejudicial to the administration of justice that brings the judicial office into disrepute." (As amended Nov. 9, 1988.)[2] ■ Because our power to discipline a judge is contingent on a recommendation of the Commission, we may not impose judicial discipline on our own initiative (*Spruance* v. *Commission on Judicial Qualifications* (1975) 13 Cal.3d 778, 784, fn. 5 [119 Cal.Rptr. 841, 532 P.2d 1209]), and we may consider only those charges of willful misconduct or prejudicial conduct that the Commission sustained (*ibid.; Dodds* v. *Commission on Judicial Performance, supra,* 12 Cal.4th at p. 168). Our review of the record is independent, however. We make findings of fact; we decide as a question of law whether the conduct warrants sanctioning the judge; and we make the ultimate decision whether to dismiss the proceeding or to admonish, censure, or remove the judge. (*Geiler* v. *Commission on Judicial Qualifications* (1973) 10 Cal.3d 270, 276 [110 Cal.Rptr. 201, 515 P.2d 1].) Accordingly, this court can conclude that a judge engaged in willful misconduct, even if the Commission found that the judge's actions were not willful misconduct, but prejudicial conduct. (See, e.g., *McCullough* v. *Commission on Judicial Performance* (1989) 49 Cal.3d 186, 195-196 [260 Cal.Rptr. 557, 776 P.2d 259]; *Ryan* v. *Commission on Judicial Performance* (1988) 45 Cal.3d 518, 535 [247 Cal.Rptr. 378, 754 P.2d 724, 76 A.L.R.4th 951].) As we have observed

[2]Article VI, section 18, of the California Constitution governs the disciplining of judges. On November 8, 1994, the voters approved Proposition 190, which significantly changed the procedure for this court's review of Commission decisions but not the grounds for judicial discipline. Because the facts here occurred before the March 1, 1995, effective date of the amendments, we apply the former version of article VI, section 18. (*Dodds* v. *Commission on Judicial Performance* (1995) 12 Cal.4th 163, 168, fn. 1 [48 Cal.Rptr.2d 106, 906 P.2d 1260].)

in the past, "the ultimate disposition rests with this court." (*Furey* v. *Commission on Judicial Performance* (1987) 43 Cal.3d 1297, 1317 [240 Cal.Rptr. 859, 743 P.2d 919], citing *Spruance* v. *Commission on Judicial Qualifications, supra,* 13 Cal.3d at pp. 799-800 & fn. 18.) Therefore, this court can, after an independent review, increase or decrease the discipline that the Commission has recommended. (See *Geiler* v. *Commission on Judicial Qualifications, supra,* 10 Cal.3d at p. 276.)

## B. *Standard of Proof*

■ In judicial discipline proceedings, this court reviews the record and determines whether there is "clear and convincing evidence" to sustain the charges to a reasonable certainty. (See, e.g., *Dodds* v. *Commission on Judicial Performance, supra,* 12 Cal.4th at p. 168; *Ryan* v. *Commission on Judicial Performance, supra,* 45 Cal.3d at p. 530.) In *In re Angelia P.* (1981) 28 Cal.3d 908, 919 [171 Cal.Rptr. 637, 623 P.2d 198], we described "clear and convincing" evidence as " ' "so clear as to leave no substantial doubt"; "sufficiently strong to command the unhesitating assent of every reasonable mind." ' " Petitioner quotes that statement to support his assertion that if the "evidence is consistent with a hypothesis urged by the judge, this court is bound to accept that hypothesis."

Petitioner in essence equates the "clear and convincing" evidentiary standard with proof beyond a reasonable doubt. Thus, he argues, any reasonable doubt must be resolved in his favor, and any fact favorable to his interests is established if it is reasonably supported by the evidence. Petitioner is wrong. Evidence of a charge is clear and convincing so long as there is a "high probability" that the charge is true. (See, e.g., *In re Angelia P., supra,* 28 Cal.3d at p. 919; BAJI No. 2.62 (8th ed. 1994); 1 Witkin, Cal. Evidence (3d ed. 1986) Burden of Proof and Presumptions, § 160, p. 137.) The evidence need not establish the fact beyond a reasonable doubt.

Equally meritless is petitioner's contention that less-than-unanimous decisions by the 11-member Commission are "inherently suspect." We give "special weight" to the factual determinations of the special masters because they had the advantage of observing the demeanor of the witnesses. (*Dodds* v. *Commission on Judicial Performance, supra,* 12 Cal.4th at p. 168.) Similarly, because of the Commission's expertise in evaluating judicial misconduct, we give "great weight" to its conclusions of law. (See *ibid.; Kennick* v. *Commission on Judicial Performance* (1990) 50 Cal.3d 297, 314 [267 Cal.Rptr. 293, 787 P.2d 591, 87 A.L.R.4th 679].) We are "particularly deferential" to the Commission when it speaks with one voice, that is, unanimously. (*Dodds* v. *Commission on Judicial Performance, supra,* at p.

168.) Lack of unanimity, however, does not render the Commission's conclusions "inherently suspect," as petitioner claims. Although we will carefully consider any diverse views expressed by the Commission, the ultimate decision we will have to make is whether there is clear and convincing evidence to sustain the charges.

### C. *Willful Misconduct and Prejudicial Conduct*

#### 1. *Willful Misconduct*

■ To commit willful misconduct in office, a judge must (1) engage in conduct that is unjudicial and (2) committed in bad faith, (3) while acting in a judicial capacity. (See, e.g., *Dodds* v. *Commission on Judicial Performance, supra,* 12 Cal.4th at p. 172; *Doan* v. *Commission on Judicial Performance* (1995) 11 Cal.4th 294, 311 [45 Cal.Rptr.2d 254, 902 P.2d 272].) Both petitioner and the CJA urge us to clarify the second of these elements. In past decisions, they note, this court has stated that judges act in bad faith when they engage in conduct they "should have known" to be beyond their lawful judicial powers. Petitioner and the CJA argue that this definition of bad faith threatens judicial independence because it allows judges to be disciplined for honest mistakes, and because the power to discipline for such mistakes may be used against judges whose decisions have generated public controversy.

This court has said that bad faith, as an element of willful misconduct in office, means "that the judge 'intentionally committed acts which he knew *or should have known* were beyond his lawful power' [citation] or 'acts within the lawful power of a judge which nevertheless [were] committed . . . for any purpose other than the faithful discharge of judicial duties' [citations]." (*Dodds* v. *Commission on Judicial Performance, supra,* 12 Cal.4th at p. 172, original bracket and ellipsis, italics added.) Although in other contexts this court has equated the phrase "should have known" with a negligence standard (see, e.g., *Carlin* v. *Superior Court* (1996) 13 Cal.4th 1104, 1112, fn. 2 [56 Cal.Rptr.2d 162, 920 P.2d 1347]), it does not have this meaning when used to define the bad faith element of willful misconduct in office. Indeed, we have *rejected* the argument that a judge's intentional commission of an act that the judge "should have known" was beyond the judge's lawful authority "is sufficient in and of itself" to demonstrate the bad faith required for willful misconduct in office. (*Gubler* v. *Commission on Judicial Performance* (1984) 37 Cal.3d 27, 46, fn. 7 [207 Cal.Rptr. 171, 688 P.2d 551].) And we have said that "negligence alone, if not so gross as to call its genuineness into question, falls short of 'bad faith.' " (*Spruance* v. *Commission on Judicial Qualifications, supra,* 13 Cal.3d at p. 796.)

In the context of defining willful misconduct in office, we have equated bad faith with "actual malice," and we have contrasted it with a conscientious purpose to faithfully discharge judicial duties. (See, e.g., *Doan* v. *Commission on Judicial Performance, supra,* 11 Cal.4th at p. 311; *Gonzalez* v. *Commission on Judicial Performance* (1983) 33 Cal.3d 359, 365 [188 Cal.Rptr. 880, 657 P.2d 372]; *Spruance* v. *Commission on Judicial Qualifications, supra,* 13 Cal.3d at p. 796.) Because transgressing the limits of a judge's lawful authority is not the faithful discharge of judicial duties, a judge who performs such acts with no regard at all for whether they are legally permitted cannot be said to be acting with a purpose to faithfully discharge judicial duties. Thus, a judge's reckless or utter indifference to whether judicial acts being performed exceed the bounds of the judge's prescribed power is a state of mind properly characterized as bad faith. Accordingly, our references in past decisions to bad faith as including judicial acts that a judge "should have known" to be beyond the judge's lawful judicial power are properly understood as referring to the state of mind in which a judge lacks actual knowledge of the limits on his or her judicial authority, is fully aware of this lack of knowledge, and fails or refuses to take reasonably available steps or to make a good faith effort to determine the extent of his or her judicial authority before undertaking to exercise it.

To summarize, we agree with petitioner and the CJA that mere negligence cannot satisfy the bad faith element of willful misconduct in office by a judge and that the phrase "should have known," because of its association in other contexts with a negligence standard, is potentially misleading and should be avoided. A judge acts in bad faith only by (1) performing a judicial act for a corrupt purpose (which is any purpose other than the faithful discharge of judicial duties), or (2) performing a judicial act with knowledge that the act is beyond the judge's lawful judicial power, or (3) performing a judicial act that exceeds the judge's lawful power with a conscious disregard for the limits of the judge's authority.

### 2. *Prejudicial Conduct*

Prejudicial conduct is distinguishable from willful misconduct in that a judge's acts may constitute prejudicial conduct even if not committed in a judicial capacity, or, if committed in a judicial capacity, not committed in bad faith. Prejudicial conduct is *"either* 'conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office' [citation] *or* 'willful misconduct out of office, i.e., unjudicial conduct committed in bad faith by a judge not then acting in a

judicial capacity' [citation]." (*Doan* v. *Commission on Judicial Performance, supra,* 11 Cal.4th at p. 312, original italics.) In this context, bad faith means a culpable mental state beyond mere negligence and consisting of either knowing or not caring that the conduct being undertaken is unjudicial and prejudicial to public esteem. In sum, to constitute prejudicial conduct, a judge's actions must bring "the judicial office into disrepute," that is, the conduct would appear to an objective observer to be prejudicial to " 'public esteem for the judicial office.' " (*Kennick* v. *Commission on Judicial Performance, supra,* 50 Cal.3d at p. 314.)

### III. REVIEW OF COMMISSION FINDINGS AND CONCLUSIONS

We now address the issues relating to the facts in this case.

### A. *Acts in Excess of Judicial Power*

The Commission agreed with the finding by a majority of the special masters that petitioner used deception in procuring a waiver of time for sentencing from criminal defendant Levert Hooks. Petitioner contends there is no clear and convincing evidence to support this finding. We disagree.

#### 1. *Facts*

Defendant Hooks, who had tested positively for human immunodeficiency virus (HIV), was convicted of five counts of raping a fifteen-year-old girl. On Thursday, January 5, 1995, when Hooks and his attorney, Charles Rothbaum, appeared before petitioner for sentencing, petitioner announced at the outset: "This is the case of People versus Levert Hooks. I would like a time waiver on this case because I would like to present some questions to you folks before we impose sentence in this case for you to think about and to do some research on."[3] When petitioner responded "yes" to Attorney Rothbaum's inquiry whether the court wanted to set the sentencing hearing for a later date, Rothbaum said, "That's fine." The prosecution likewise agreed. Petitioner continued the sentencing hearing to March 7, 1995. The following colloquy between defense counsel and petitioner then took place:

"MR. ROTHBAUM: Can I inquire as to what you plan on doing between now and then in this case? It's a long delay. We don't mind. I'm just wondering what you're up to.

"THE COURT: I'm going to be asking you some questions to do some research on.

---

[3]Because a criminal defendant has a statutory right to be sentenced within 20 judicial days of the verdict of guilty (Pen. Code, § 1191), the imposition of sentence beyond that period requires the defendant's waiver of the time for sentencing.

"MR. ROTHBAUM: Three months worth of research?

"THE COURT: Well, isn't that two months?

"MR. ROTHBAUM: Two months. Well, all right, two months worth of research.

"THE COURT: *Trust me*.

"MR. ROTHBAUM: All right. That's fine.

"THE COURT: Is that okay with you, Mr. Hooks?

"THE DEFENDANT: Yeah." (Italics added.)

Petitioner then mentioned that he had heard over the radio that it cost the state $100,000 a year to provide medical treatment for an incarcerated HIV-positive inmate. After noting the probation report's recommended sentence of 40 years in prison, petitioner explained what he had in mind: "What I have thought of is a potential order that once the conviction is final that the government doctors shall not be required to provide prophylactic medicine or medicine to treat the incurable disease, but rather shall be required to provide him with food, hydration, and pain medication."[4]

Defense counsel Rothbaum immediately moved to withdraw his client's waiver of the time for sentencing. When petitioner denied the motion, defense counsel stated: "[W]hat you've basically done today is to extract from Mr. Hooks, without him knowing it, a waiver of time in order for you to be able to divest him, if you can, of what he at the present time is entitled to, which is medical care while he is in custody of the California Correctional System. [¶] There is no way that he is going to assist the court in divesting him of medical treatment if, in fact, he needs it and he's entitled to it. That's what you are asking us to do. [¶] You're asking him to let you have two months to see if you can screw him basically. That's not right. That's not right. And I didn't understand it. [¶] I certainly had no understanding of what was going on here when you made the request for the time waiver because you didn't tell me what it was about. And I certainly can't join in the entry of a waiver once I know the reason for it. [¶] It wasn't a knowing—it wasn't a knowing waiver."

---

[4]While this proceeding was pending before this court, the United States Supreme Court held, in *Bragdon* v. *Abbott* (1998) __ U.S. __ [118 S.Ct. 2196, 141 L.Ed.2d 540], that HIV is a disability within the meaning of the Americans with Disabilities Act of 1990 (ADA) (42 U.S.C. § 12101 et seq.) even when the infection has not progressed to the symptomatic stage. The high court also held the ADA applies to inmates in state prisons (*Pennsylvania Department of Corrections* v. *Yeskey* (1998) __ U.S. __ [118 S.Ct. 1952, 141 L.Ed.2d 215]).

Petitioner responded: "He may not have known why, but he knew he was waiving time."

Later that day, after the hearing had been concluded, petitioner asked his clerk to notify both the prosecution and the defense attorney that the Hooks case had been placed on the court's calendar for the following Monday, January 9, at 8:30 a.m.

On Friday, January 6, the day after the sentencing hearing involving the waiver, a local newspaper, the Visalia Times-Delta, reported the statements petitioner had made at the hearing regarding his concern about the high cost of providing medical care to HIV-positive inmates. The article also mentioned the prosecution's view that the matter should be left to the correctional system. And it quoted defense attorney Rothbaum, who described petitioner's proposal to order the prison to withhold medical treatment from defendant Hooks as cruel and unusual punishment, and a "barbaric" attempt to impose a death sentence.

At the Monday, January 9, 1995, hearing, petitioner told the parties that he had placed the Hooks matter back on the court's calendar to clarify that his concern was with the allocation of resources within the prison system, not with HIV. He added: "A review of the transcript indicates that I misspoke. I told Mr. Rothbaum to trust me. And what I meant to say was, 'Mr. Rothbaum, trust me, you'll need all this time for the research.' And I didn't indicate that, and I think that that may have been misleading to Mr. Rothbaum." Rothbaum responded that he was misled by petitioner's failure to disclose his real purpose for requesting a time waiver, not by the "trust me" remark. Petitioner sentenced Hooks to a total of 50 years in prison on the 5 counts of rape. The sentence made no mention of medical treatment.

### 2. *Commission's Findings and Conclusions*

The Commission, by a vote of nine to two, found that petitioner's conduct in obtaining the time waiver in the Hooks case was improper. Although the Commission observed that petitioner's conduct "could plainly be willful misconduct," it nevertheless found petitioner's actions to be prejudicial conduct rather than willful misconduct because petitioner had, by putting the matter back on the court's calendar, acted promptly to correct his actions. The two dissenting commissioners voted to dismiss the charge.

### 3. *Our Review of the Commission's Decision*

After an independent review of the record (*Dodds* v. *Commission on Judicial Performance, supra,* 12 Cal.4th at p. 168), we conclude there is clear

and convincing evidence that petitioner engaged in willful misconduct in office in obtaining the waiver of the time for sentencing in People v. Hooks.

As we noted before, a judge engages in willful misconduct when, while acting in a judicial capacity, the judge acts in a manner that is unjudicial and in bad faith (that is, for a purpose other than the faithful discharge of judicial duties, or with knowledge that the act is beyond the judicial power, or with a conscious disregard for the limits of the judge's authority). As described in detail earlier, petitioner began the sentencing hearing by asking defense counsel and defendant Hooks to waive time for sentencing because he had "some questions" that he wanted the attorneys for both parties to research. When neither attorney indicated a problem in continuing the sentencing hearing to some future date, petitioner set the hearing for March 7, 1995. At that point, defense counsel expressed concern about the two-month delay: "Can I inquire as to what you plan on doing between now and then in this case? It is a long delay. We don't mind. I'm just wondering what you're up to." Petitioner reiterated his desire to have the attorneys do research on "some questions." When defense counsel inquired as to the need for "two months of research," petitioner replied: "Trust me."

Only after obtaining a time waiver from both defense counsel and defendant Hooks did petitioner disclose that he wanted the attorneys to research whether he could order prison authorities to withhold from an HIV-positive inmate, such as defendant Hooks, any medical treatment for that condition. Defense counsel then strenuously objected, stating that his client was entitled to medical treatment, adding: "That's not right. That's not right. And I didn't understand it. [¶] I certainly had no understanding of what was going on here when you made the request for the time waiver because you didn't tell me what it was about. And I certainly can't join in the entry of a waiver once I know the reason for it. [¶] It wasn't a knowing—it wasn't a knowing waiver."

As this exchange demonstrates, petitioner did not reveal the real reason for his request for a time waiver until he, after asking defense counsel to "trust" him, received a time waiver from defendant and his counsel.

According to petitioner and his amicus curiae, the CJA, petitioner's "trust me" response referred to the substantial time (two months) that the attorneys would need to research the issue of withholding medical treatment from defendant Hooks during his incarceration in prison, and it had no bearing on the waiver issue. Even if we were to agree with this interpretation of the record, it is clear from defense counsel's vigorous disagreement with the continuance immediately after petitioner revealed the real reason for the

continuance that petitioner had indeed "tricked" counsel into agreeing to the continuance. As the Commission in this case pointed out: "Judges have a special responsibility to deal honestly and forthrightly with all who appear before them, and when a judge displays a lack of integrity, as did [petitioner] in *Hooks,* confidence in the entire judiciary is weakened." A judge's attempt to "take [an attorney] unawares" by concealing material information, as petitioner did here, is "an abuse of the judicial process" constituting willful misconduct. (*Wenger* v. *Commission on Judicial Performance* (1981) 29 Cal.3d 615, 631 [175 Cal.Rptr. 420, 630 P.2d 954].)

### B. *Public Comment on Pending Cases*

At the time relevant here, canon 3A(6) of the former California Code of Judicial Conduct prohibited judges from making "public comment about a pending or impending proceeding in any court . . . ."[5]

Count 2 charged petitioner with violating former canon 3A(6) by publicly commenting on two criminal cases that were pending either in his court or in the Court of Appeal, *People* v. *Zaring* and *People* v. *Johnson,* and by continuing to do so after the Commission had advised him of the impropriety of his conduct. A discussion of the pertinent facts in these two cases follows.

### 1. *People v. Zaring*

Defendant Linda Zaring pleaded guilty to possessing and being under the influence of a controlled substance. Petitioner placed her on probation for five years on the condition, among others, that she "not get pregnant" during this period. Petitioner told Zaring: "You're thirty years old. None of your children are in your custody or control. Two of them on AFDC. And I'm afraid that if you get pregnant we're going to get a cocaine or heroin addicted baby." At a later proceeding, when Zaring was 22 minutes late for a court appearance, petitioner immediately revoked her probation and remanded her to the custody of the sheriff. On appeal, the court affirmed the conviction but held that the "no pregnancy" probation condition was overbroad, and thus invalid, because it impinged upon the exercise of the fundamental right to privacy. As to petitioner's order revoking probation, the Court of Appeal found that to be an abuse of discretion. (*People* v. *Zaring* (1992) 8 Cal.App.4th 362, 370-373, 379 [10 Cal.Rptr.2d 263].)

---

[5]The California Code of Judicial Conduct was replaced by the California Code of Judicial Ethics, effective January 15, 1996. The substance of former canon 3A(6) now appears in canon 3B(9) of the 1996 California Code of Judicial Ethics. Canon 3B(9), like former canon 3A(6), prohibits judges from making "public comment about a pending or impending proceeding in any court . . . ."

### 2. *People v. Johnson*

Defendant Darlene Johnson pleaded guilty to three felony counts of corporal injury to two of her children. Petitioner granted probation to Johnson, who was then seven months' pregnant, and, after Johnson told him that she did not want to get pregnant again, imposed a probation condition that she be implanted with "Norplant," a birth control device then newly approved by the federal Food and Drug Administration. At a later hearing, petitioner denied Johnson's request to delete the Norplant birth control condition. But he granted Johnson's motion to stay imposition of that condition pending appeal, and he disqualified himself from further proceedings in the case. Following revocation of Johnson's probation by another judge, the Court of Appeal dismissed Johnson's appeal as moot.

On March 18, 1991, the Commission notified petitioner in writing that it had ordered a preliminary investigation to determine whether he had violated former canon 3A(6) of the California Code of Judicial Conduct by publicly commenting on the *Johnson* case, first while it was pending in his court and later while it was on appeal. The letter went on to state that when the Norplant probation condition attracted national media attention, petitioner publicly explained his reasons for imposing the condition. The Commission noted that petitioner's public comments *before* the date of the hearing at which he considered defendant Johnson's motion to reconsider the Norplant probation condition created the appearance that he had prejudged the motion, and that his comments *after* that date gave the appearance that he was trying to influence the decision on appeal, thereby undermining public confidence in the judiciary's objectivity and impartiality.

Also in March 1991, apparently before the Commission's letter to petitioner just described, petitioner gave an interview to West Magazine explaining his reasons for the probation conditions in both the *Zaring* and *Johnson* cases. An article reporting this interview was published on July 9, 1991.

On April 4, 1991, petitioner responded in writing to the Commission's letter of March 18 pertaining to the Norplant condition in the *Johnson* case. He said that since becoming a judge he had been fully aware of former canon 3A(6)'s prohibition against publicly commenting on pending cases. He admitted giving interviews to several newspapers and television shows regarding the *Johnson* case, but stated that he had not sought media attention and had declined to appear on a number of television shows. Through his comments, he said, he had sought to explain both the Norplant probation condition and court procedures; and, when first interviewed, he did not know that defendant Johnson would file a motion to have him reconsider the Norplant condition.

On May 16, 1991, the Commission notified petitioner by letter that it had rejected his claim that his comments were confined to procedural matters, concluding that he had violated former canon 3A(6). The Commission found petitioner's comments to detract from the appearance of judicial impartiality, and it directed his attention to former canon 2, which prohibited judicial conduct creating the appearance of impropriety. Nevertheless, while expressing "strong reservations," the letter informed petitioner that "the facts do not constitute grounds for proceeding further and [the Commission] determined to close its preliminary investigation of your statements to the media and issue this advisory letter."

In November 1991, petitioner gave an interview to Time magazine at his home. He again publicly commented on the *Johnson* case and defended himself against criticism of the Norplant probation condition. The article reporting this interview was published on March 9, 1992.

### 3. *Commission's Findings and Conclusions*

The Commission found as follows: When, in interviews he gave to West Magazine and Time, petitioner publicly commented on the "no pregnancy" probation conditions in the *Johnson* and *Zaring* cases, those cases were pending on appeal. Petitioner knew of former canon 3A(6)'s prohibition against publicly commenting on pending cases. He gave an interview to Time magazine and commented on the then-pending *Johnson* case *after* the Commission's letter to him stating that public comment on pending cases was improper. Petitioner conceded to the special masters that his public comments to Time and West Magazine violated the canon in question.

The Commission unanimously concluded that petitioner's actions constituted prejudicial conduct. It dismissed the charges concerning petitioner's public comments in interviews given to other publications "in view of the Commission's findings of conduct prejudicial as to [the West Magazine and Time interviews], and in view of the potential for overlapping sanctions . . . ."

### 4. *Our Review of the Commission's Decision*

Petitioner concedes that he violated former canon 3A(6) when he publicly commented on the "no pregnancy" probation conditions he had imposed in the *Johnson* and *Zaring* cases. He insists, however, that no discipline can be imposed because as a judge he has a right under the First Amendment to the federal Constitution to make public comments on pending cases unless those comments pose a "substantial likelihood of material

prejudice" to a fair trial. In support he cites the United States Supreme Court's decision in *Gentile* v. *State Bar of Nevada* (1991) 501 U.S. 1030 [111 S.Ct. 2720, 115 L.Ed.2d 888], upholding a Nevada Supreme Court rule prohibiting lawyers from making public comments on pending cases that would pose a "substantial likelihood of materially prejudicing" a legal proceeding. We are not persuaded that the same standard applies to judges.

When a regulation implicates First Amendment rights, the constitutional validity of the restriction is determined by balancing the First Amendment interest against the state's legitimate interest in regulating the activity in issue. (See, e.g., *Gentile* v. *State Bar of Nevada, supra,* 501 U.S. at p. 1075 [111 S.Ct. at p. 2745]; *Seattle Times Co.* v. *Rhinehart* (1984) 467 U.S. 20, 32 [104 S.Ct. 2199, 2207, 81 L.Ed.2d 17].) Lawyers' "extrajudicial statements pose a threat to the fairness of a pending proceeding since lawyers' statements are likely to be received as especially authoritative." (*Gentile* v. *State Bar of Nevada, supra,* at p. 1074 [111 S.Ct. at p. 2745].) For this reason, regulation of public commentary by lawyers in pending cases serves the state's interest in ensuring fair trials. (*Id.* at p. 1075 [111 S.Ct. at p. 2745].) The state has a greater interest, however, in regulating the public commentary by a *judge* during the pendency of a proceeding, as explained below.

Because judges and attorneys play different roles in the judicial process, their public comments on pending judicial proceedings threaten the fairness of those proceedings in different ways and to different degrees. The public understands that in judicial proceedings lawyers, although also officers of the court, are advocates for the interests of their clients (see, e.g., *Gentile* v. *State Bar of Nevada, supra,* 501 U.S. at p. 1051 [111 S.Ct. at pp. 2732-2733] [professional mission of criminal defense bar is to challenge actions of the state]); therefore, the public does not expect a high degree of neutrality or objectivity when lawyers comment on pending cases, nor does the public expect all attorneys to assess the merits of pending cases in the same way. Judges, by contrast, cannot be advocates for the interests of any parties; they must be, and be perceived to be, neutral arbiters of both fact and law (see Preamble, Cal. Code Jud. Ethics) who apply the law uniformly and consistently. Because judges are both "highly visible member[s] of government" (*ibid.*) and neutral decision makers in all court proceedings, their public comments will be received by the public as more authoritative than those of lawyers. And because judges have this greater influence over public opinion, inappropriate public comment by judges poses a much greater threat to the fairness of judicial proceedings than improper public comment by lawyers.

A judge's public comment on a pending case threatens the state's interest in maintaining public confidence in the judiciary whether or not the case to

which the comment is directed is pending before the commenting judge. When the case is pending before the commenting judge, the public may perceive the comment as indicating that the judge has prejudged the merits of the controversy or is biased against or in favor of one of the parties. (Rothman, Cal. Judicial Conduct Handbook (1990) § 160.550, p. I-39.) When the case is pending before a judge other than the commenting judge, the public may perceive the comment as an attempt to influence the judge who is charged with deciding the case. (*Ibid.*) Such comments may also create the public impression that the judge has abandoned the judicial role to become an advocate for the judge's own ruling or for the position advanced by one of the parties.

The United States Supreme Court has not yet considered what limits the First Amendment to the federal Constitution imposes on a state's authority to restrict judges from publicly commenting on pending cases. The court has, however, addressed First Amendment limitations on a state's authority generally to regulate public speech by public employees. In *Pickering* v. *Board of Education* (1968) 391 U.S. 563 [88 S.Ct. 1731, 20 L.Ed.2d 811] (*Pickering*), the high court held that the validity of a regulation limiting public employee speech is to be determined by balancing the interests of the employee "as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." (*Id.* at p. 568 [88 S.Ct. at pp. 1734-1735].) Because the state's interests in protecting the integrity of the judiciary and in maintaining public confidence in the judiciary are at least as strong as its interest in promoting the efficiency of public services generally, we conclude that the First Amendment protection for public comment on pending cases by judges is no more protective of judges, who are also public employees, than the standard articulated by the United States Supreme Court for evaluating the regulation of public employee speech generally. (Accord, *In re Schenck* (1994) 318 Or. 402, 433 [870 P.2d 185, 204], cert. den. 513 U.S. 871 [115 S.Ct. 195, 130 L.Ed.2d 127] [adopting the *Pickering* standard for judicial comment on pending cases]; see Gross, *Judicial Speech: Discipline and the First Amendment* (1986) 36 Syracuse L.Rev. 1181, 1184-1190; see generally, Annot., First Amendment Protection for Judges or Government Attorneys Subjected to Discharge, Transfer, or Discipline Because of Speech (1992) 108 A.L.R.Fed. 117, 126-127.) And we reject petitioner's proposed standard permitting judges to comment publicly on any pending case unless the particular comment poses a "substantial likelihood of material prejudice," for it affords insufficient protection to the state's interest in both the fact and the appearance of judicial impartiality and integrity.

To better understand how the *Pickering* test works, we consider those decisions in which the United States Supreme Court has applied it. In

*Pickering, supra,* 391 U.S. 563, a board of education had dismissed a high school teacher for publicly criticizing the board's allocation of school funds between athletics and education and the board's method of informing the public regarding the need for additional revenue. To determine whether this restriction on a public employee's speech was permissible under the First Amendment, the United States Supreme Court balanced the teacher's interest in commenting upon these matters of public concern against the school district's interest in promoting the efficiency of public schools. (391 U.S. at p. 568 [88 S.Ct. at pp. 1734-1735].) The court concluded that the school board had violated the First Amendment because the teacher's interest outweighed the district's interest. (391 U.S. at pp. 571-573 [88 S.Ct. at pp. 1736-1737].) The court has since used this same analysis in other cases involving restrictions on public employee speech. (See, e.g., *Perry* v. *Sindermann* (1972) 408 U.S. 593 [92 S.Ct. 2694, 33 L.Ed.2d 570] [refusal to rehire teacher who had testified before state legislature]; *Mt. Healthy City Board of Ed.* v. *Doyle* (1977) 429 U.S. 274 [97 S.Ct. 568, 50 L.Ed.2d 471] [refusal to rehire teacher for relaying substance of teacher dress and appearance memorandum to radio station]; *Givnan* v. *Western Line Consolidated School Dist.* (1979) 439 U.S. 410 [99 S.Ct. 693, 58 L.Ed.2d 619] [termination of teacher based on private communications alleging racially discriminatory policies of school district].) In *Connick* v. *Myers* (1983) 461 U.S. 138, 146 [103 S.Ct. 1684, 1689-1690, 75 L.Ed.2d 708], the high court held that the First Amendment protection for public employee speech on a subject of no public concern is less than for speech addressed to matters of significant public interest.

The United States Supreme Court has applied this balancing test not only to determine the validity of the discipline imposed on particular public employees for particular public speech, but also to determine the facial validity of broadly worded speech regulations similar to former canon 3A(6). For example, the court used the *Pickering* balancing test to strike down a statute that prohibited federal employees from accepting compensation for giving speeches or writing articles regardless of whether the subject of the speech or the article, or the sponsoring group, had any connection to the employee's official duties. (*United States* v. *Treasury Employees* (1995) 513 U.S. 454, 466-467 [115 S.Ct. 1003, 1012-1013, 130 L.Ed.2d 964].) In another case, the high court applied the *Pickering* test to uphold, as constitutional on its face, a federal statute prohibiting federal employees from taking an active part in political management or in political campaigns. (*CSC* v. *Letter Carriers* (1973) 413 U.S. 548, 564 [93 S.Ct. 2880, 2889-2890, 37 L.Ed.2d 796]; see *United States* v. *Treasury Employees, supra,* at p. 467 [115 S.Ct. at p. 1013], reaffirming *United Public Workers* v. *Mitchell* (1947) 330 U.S. 75 [67 S.Ct. 556, 91 L.Ed. 754].) Accordingly, the *Pickering* balancing

test may properly be used to determine the facial validity, against a First Amendment challenge, of regulations such as former canon 3A(6).

Generally speaking, court proceedings are matters of public concern and, again generally speaking, judges have as great an interest as other individuals in commenting publicly on these proceedings. Under the *Pickering* test described above, we determine the validity of former canon 3A(6) under the First Amendment by balancing this general interest of judges in making public comments on court proceedings against the state's interest in the soundness of the judicial system. In doing so, we note that former canon 3A(6)'s restrictions on public comment by judges are narrowly drawn to apply only to proceedings that are pending or impending, not those that have become final, and that the former canon "does not prohibit judges from making public statements in the course of their official duties or from explaining for public information the procedures of the court" (Cal. Code Jud. Conduct, former canon 3A(6)).

As we have explained, there is a compelling public interest in maintaining a judicial system that both is in fact and is publicly perceived as being fair, impartial, and efficient. As we have also explained, former canon 3A(6) effectively promotes this interest because public comments by judges on matters pending before them may give the appearance that the judge has prejudged the merits of the controversy, has become an advocate for the interests of one of the parties, or has resorted to extrajudicial means to defend the judge's own rulings. As applied to comments on matters pending before another judge, the former canon prevents a judge from exerting, or appearing to exert, pressure on another judge to decide a matter a particular way. Accordingly, we conclude that the burden that former canon 3A(6) imposes on the general interest of judges in making public comments on court proceedings is outweighed by the benefits it achieves in furthering the state's interest in the soundness of the judicial system; therefore, former canon 3A(6) is not invalid under the First Amendment as an impermissible restriction on public speech.[6]

We also reject as meritless petitioner's assertion that former canon 3A(6) is void for vagueness. A rule is not void for vagueness if it provides " ' "fair notice to those to whom [it] is directed." ' " (*Gentile* v. *State Bar of*

---

[6]Although we reach this conclusion by applying the test that the high court articulated in *Pickering, supra,* 391 U.S. 563, the same conclusion would likely follow from application of the *Gentile* standard that petitioner urges us to adopt. (See, e.g., *In re Inquiry of Broadbelt* (1996) 146 N.J. 501, 519 [683 A.2d 543, 552] [applying *Gentile* standard upholding canon restricting judges' public comments on pending cases].)

*Nevada, supra,* 501 U.S. at p. 1048 [111 S.Ct. at p. 2731], original brackets.) We find unconvincing petitioner's assertion that he had "difficulties in determining if public comment was prohibited" in a case, such as *People* v. *Johnson,* in which he had recused himself from any further participation while the decision was pending on appeal. The former canon clearly included matters pending on appeal. It expressly referred to a proceeding pending "in any court." We also find unpersuasive petitioner's claim that he was left to guess how "public" a public comment had to be to violate the former canon. A matter is public if it is open or available to all, that is, accessible to everybody. (Webster's New Internat. Dict. (2d ed. 1941) p. 2005, col 1.) The words "public comment" in the former canon gave petitioner fair notice that it referred to comments disseminated to the community.

■ Having decided that former canon 3A(6)'s prohibition against public comment on pending cases by judges is permissible under the First Amendment to the federal Constitution, we now determine whether petitioner's acts constituted judicial misconduct.

A finding of *willful misconduct in office* requires that the misconduct occur while the judge is acting in a judicial capacity. A judge is acting in a judicial capacity while performing one of the functions, whether adjudicative or administrative in nature, that are associated with the position of a judge or when the judge uses or attempts to use the authority of the judicial office for an improper purpose. (*Dodds* v. *Commission on Judicial Performance, supra,* 12 Cal.4th at p. 172; see *Kennick* v. *Commission on Judicial Performance, supra,* 50 Cal.3d at p. 319.) Petitioner's public comments were made in the course of interviews with the press, not while he was acting in a judicial capacity. They therefore cannot constitute willful misconduct in office. As the Commission correctly concluded, however, petitioner's actions constituted *prejudicial conduct,* that is, " 'conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to the public esteem for the judicial office . . . .' " (*Doan* v. *Commission on Judicial Performance, supra,* 11 Cal.4th at p. 312.) Petitioner engaged in unjudicial conduct by violating a canon of judicial conduct, former canon 3(A)(6), with knowledge of its restrictions. By making public comments in an attempt to justify and defend his decisions while those decisions were pending on appeal, petitioner adopted the role of an advocate. Such actions would appear to an objective observer to be " 'prejudicial to public esteem for the judicial office.' " (*Kennick* v. *Commission on Judicial Performance, supra,* 50 Cal.3d at p. 314.)

## C. *Abuse of the Judicial Office*

The Commission's final charge was that petitioner failed, in matters involving Attorney Arthur Kralowec, to conduct himself "in a manner that promotes public confidence in the integrity and impartiality of the judiciary."

### 1. *Facts*

In 1983, *before* petitioner became a judge, he represented a party in a case in which Attorney Kralowec was the opposing counsel. The relationship between petitioner and Kralowec developed into one of intense antagonism.

In 1994, *after* petitioner became a judge, Attorney Kralowec represented one of petitioner's former clients, Darlene Woods, in Woods v. Broadman, a legal malpractice action against petitioner. While the case was pending, Kralowec himself was the defendant in another legal malpractice action, Metzger v. Kralowec. Attorney Thomas Anton represented plaintiff Metzger, who faulted Kralowec for not disqualifying petitioner from ruling in the underlying action on a motion for summary judgment and ordering arbitration of the matter. At the trial in Metzger v. Kralowec, which was tried before another judge of the Tulare Superior Court in 1995, petitioner's name was mentioned by participants in the trial 150 to 200 times.

At one point in the malpractice action against Kralowec, the court reporter told plaintiff Metzger's attorney, Thomas Anton, that petitioner would like to see him. When Anton made no effort to see petitioner, the court reporter again told Anton that petitioner wanted to see him, a communication that Anton at that point considered an order. Later, during the lunch break in that day's proceedings in the Metzger case, Anton met with petitioner in petitioner's chambers.

At this meeting, petitioner offered to testify on behalf of Attorney Anton's client. When Anton expressed interest in learning when Attorney Kralowec started representing plaintiff Woods in the malpractice action against petitioner, the latter telephoned the court clerk's office, identified himself as "Judge Broadman," and requested that the file in Woods v. Broadman be made available to Anton. When the conversation turned to the subject of a State Bar investigation of Attorney Kralowec, petitioner telephoned the State Bar, identified himself as "Judge Broadman," and asked about the status of the investigation. Turning to Attorney Anton's representation of the plaintiff

in the malpractice action against Kralowec, petitioner mentioned that in the past Kralowec had hidden his assets and it would be difficult to collect on a judgment against Kralowec. At a later point, when petitioner and Anton met in the court hallway, petitioner told Anton not to mention the meeting to anyone.

Thereafter, during the punitive damages portion of the trial in Metzger v. Kralowec, petitioner entered the courtroom and briefly sat in the audience while Attorney Kralowec was testifying. The jurors, some of whom knew petitioner was a judge, noted and discussed his visit. When a court employee asked petitioner why he had come to Kralowec's trial, petitioner replied that he was "just being an asshole."

### 2. Commission's Findings and Conclusions

The Commission, by a vote of six to five (five voting to dismiss), found petitioner's actions in the Kralowec matter to be *prejudicial conduct*. It agreed with the special masters that petitioner's acts had been motivated by a desire "to harm his old adversary," Attorney Kralowec, and it determined that petitioner had acted more as a "vigilante" than as a judge. The Commission concluded that those actions were not willful misconduct because they occurred while petitioner was acting in a nonjudicial capacity.

### 3. Our Review of the Commission's Decision

We agree with the Commission's determination that petitioner's acts in Metzger v. Kralowec were not willful misconduct. As we discussed earlier, one of the elements of willful misconduct is that the judge must have acted in a judicial capacity. Here, neither petitioner's meeting in his chambers with Attorney Anton nor his brief appearance in the courtroom where the case of Metzger v. Kralowec was being tried was an act within his judicial capacity: Neither instance involved any adjudicative or administrative functions of petitioner's judicial office.

But, as the Commission determined, petitioner's acts did constitute prejudicial conduct, that is, conduct that would appear to an objective observer to be prejudicial to " 'public esteem for the judicial office.' " (*Kennick* v. *Commission on Judicial Performance, supra,* 50 Cal.3d at p. 314.)

Through his actions, as described in detail at the beginning of this section, petitioner tried to affect the outcome in the legal malpractice case involving

Attorney Kralowec, against whom he bore personal animosity. While the case was being tried before another judge, petitioner summoned Attorney Anton, who represented plaintiff Metzger, to his chambers. There, petitioner expressed his intense dislike of Kralowec and offered assistance in strengthening the plaintiff's malpractice action against Kralowec. In petitioner's words, he hoped that Anton would "kick the son of a bitch's ass." He offered to testify against Kralowec, he telephoned for delivery of a court file in a different malpractice action, and he checked with the State Bar to find out the status of a complaint against Kralowec, all in an effort to assist Attorney Anton in the malpractice case against Kralowec. Later, during Kralowec's testimony, petitioner briefly attended the trial; the jurors, some of whom knew petitioner to be a judge, noted and discussed his visit. When a court employee asked why petitioner had come to Kralowec's trial, petitioner replied he was "just being an asshole." We agree with the Commission that taken together petitioner's actions, which were motivated by "a desire to bring about a result harmful to Kralowec because of personal animosity between them," would appear to an objective observer to be prejudicial to the public esteem for the judicial office.

We reject petitioner's contention that he had a duty, under this court's decision in *Dodds* v. *Commission on Judicial Performance, supra,* 12 Cal.4th 163, to visit the courtroom in which Attorney Kralowec was testifying in Metzger v. Kralowec to take "active steps to prevent or discourage perjury." *Dodds* is distinguishable. Judge Dodds saw another judge letting the air out of the tires of a van belonging to a disabled person who had parked in the judge's parking space. We held that Judge Dodds engaged in prejudicial conduct by, among other things, failing to report the incident as required by former canon 3D and for initially refusing to give a statement to a detective investigating the matter. (12 Cal.4th at pp. 170-171.) Here, petitioner came to the courtroom because, as he explained, he thought Kralowec might perjure himself. That was pure speculation on petitioner's part. *Dodds* does not impose a duty on a judge to take action to prevent any speculative misconduct.

We also reject petitioner's argument that his actions in Metzger v. Kralowec are protected by the First and Fourteenth Amendments to the United States Constitution because he was acting as a private person in a private dispute. As petitioner notes, his position as a judge does not divest him of constitutional rights. (See *Pickering, supra,* 391 U.S. at p. 568 [88 S.Ct. at pp. 1734-1735].) But that does not mean that his rights are therefore the same as those of a private citizen. The state's interest in regulating conduct increases correspondingly with the authority and accountability of the public position at issue. (*Rankin* v. *McPherson* (1987) 483 U.S. 378, 390-391 [107

S.Ct. 2891, 2900-2901, 97 L.Ed.2d 315].) As a judge, petitioner's rights do not extend to protecting conduct that would appear to an objective observer to be prejudicial to the public esteem for the judiciary.

## IV. DUE PROCESS

 Petitioner contends he cannot be disciplined because the Commission's proceedings violated his right to due process under the Fourteenth Amendment to the federal Constitution.

Petitioner first complains about the Commission's role in this court's appointment of the special masters. Our order appointing the special masters in this matter states that "the following judges, selected by the commission from a list submitted by the Supreme Court, are hereby appointed Special Masters . . . ." Petitioner argues that this method of selecting the special masters violates due process because, under former rule 907 of the California Rules of Court, the Commission cannot have any role in the selection of special masters beyond requesting this court to make the appointments. We disagree. Former rule 907 provided in relevant part: "In place of or in addition to a hearing before the Commission, the Commission may request the Supreme Court to appoint three special masters to hear and take evidence in the matter, and to report to the Commission." Although our order stated that the three special masters in this case were "selected by the commission," the list from which the Commission selected the special masters was provided by this court and the special masters were actually appointed by this court. Nothing in former rule 907 prohibits this court from considering, that is, accepting or rejecting, a recommendation of the Commission for the appointment of special masters whose names the Commission drew from a list provided by this court.

Petitioner next complains that the Commission's staff and examiners violated his due process rights because they did not start interviewing witnesses until almost two years after the first notice of formal proceedings in May 1993. This delay, petitioner argues, violated his right to due process because it impaired the ability of witnesses to remember events. Petitioner, however, has failed to demonstrate prejudice by the delay. He does not identify the testimony of any material witness whose memory was impaired by the passage of time. In addition, several of the charges against petitioner concerned matters the Commission could adequately investigate without questioning witnesses. For example, pertinent information on the charges pertaining to petitioner's actions in court could be obtained from court transcripts. Likewise, information on the charges relating to petitioner's

public comment on pending cases could be found in publications containing petitioner's interviews. (See *Kloepfer* v. *Commission on Judicial Performance* (1989) 49 Cal.3d 826, 837 [264 Cal.Rptr. 100, 782 P.2d 239, 89 A.L.R.4th 235].)

Petitioner also accuses the Commission of including unfounded and inflammatory allegations in the third amended notice of formal proceedings, as a result of which, petitioner asserts, he "suffered an injustice." Count 2 alleged that in an interview petitioner gave to West Magazine he "quoted defendant Linda Zaring (who is African-American) while 'mimicking a black accent.' " On the first day of the hearing before the special masters, the Commission's counsel moved to strike this allegation after learning that Zaring was White. The special masters granted the motion. Because this error was corrected before any evidence was presented, petitioner suffered no prejudice.

Petitioner next argues that he had to defend against allegations not included in the pleadings, specifically allegations that he had through deception obtained defendant Johnson's consent to the Norplant condition of probation, and that he improperly resorted to the use of court personnel in *Metzger* v. *Kralowec,* a case not assigned to him. It is true that neither allegation appeared in the pleadings. Petitioner, however, has not shown that he was surprised, disadvantaged, or otherwise legally prejudiced by these allegations.

Petitioner further contends he suffered prejudice from a "delay" by the Commission in bringing the proceedings to a hearing. A claim of undue delay requires a showing of actual prejudice. (See *Kloepfer* v. *Commission on Judicial Performance, supra,* 49 Cal.3d at p. 837.) Petitioner has failed to make such a showing. As to petitioner's claim that he was disadvantaged by lapses in his memory in two instances, both pertain to counts that were dismissed; thus, petitioner suffered no prejudice.

Additionally, petitioner contends that at the hearing before the special masters, the Commission's attorneys "ambushed" him by not timely providing his counsel with notes of a discussion between one of the Commission's attorneys and witness Thomas Richey. Attorney Richey had witnessed an incident that led to a charge (later dismissed) that petitioner "showed a lack of judicial temperament and impartiality" by ordering Attorney Kralowec out of his courtroom. While discussing this matter with Commission examiner Dennis Coupe, Richey mentioned that a client of his wanted to file a complaint with the Commission about petitioner. Coupe sent

notes of this conversation to his cocounsel in Los Angeles. Cocounsel, for unknown reasons, never received the notes. At the time Coupe made his notes and sent them to his coexaminer, he did not consider the information about the incident described by Richey discoverable. As Coupe stated in his declaration: "The new incident was not relevant to any pending charge, and I did not see how any Richey testimony on it could come in as rebuttal to any existing charge." The notes were not provided to petitioner's counsel before the hearing.

The Commission's examiners decided to call Richey as a witness to the incident in which petitioner ordered Attorney Kralowec out of his courtroom. One day before he testified, Richey told Rene Sample, an associate of petitioner's counsel, that petitioner had "brutalized" one of his clients and suggested that petitioner's counsel not question him regarding any character issues. Sample told Richey not to worry because any unfavorable character evidence pertaining to petitioner would not be admissible. Sample's notes of the conversation included Richey's comment that 90 percent of petitioner's conduct was "a cut above that of other judges," but they did not mention the "brutalizing" incident involving Richey's client.

Before putting Richey on the witness stand, the examiners called Mary Rogers, a law partner of Richey's, as a witness to the incident in which petitioner had ordered Attorney Kralowec out of the courtroom. After Rogers's testimony, petitioner made her his own witness to present mitigation testimony. When Commission examiner Coupe realized that petitioner might also call Richey, who had not yet testified, as his own witness to present mitigation testimony, Coupe gave Stephen Cornwell, petitioner's counsel, a copy of the notes of his conversation with Richey. After the examiners had concluded their questioning of Richey, petitioner's attorneys did indeed call Richey as a witness for petitioner for the purpose of presenting mitigation evidence. Richey testified that 90 percent of petitioner's conduct was "a cut above" that of other judges. On cross-examination, when one of the examiners asked Richey about the remaining 10 percent, Richey mentioned that petitioner had "brutalized" a client of his. Petitioner's counsel did not object to the cross-examination, but he later moved to strike the testimony. The special masters denied the motion on a two-to-one vote.

Although Commission examiner Coupe did not make his notes pertaining to his conversation with Richey immediately available to petitioner's counsel, Coupe did provide them to petitioner's counsel before Richey testified as a mitigation witness for petitioner. After reviewing those notes, petitioner's counsel did not seek a continuance; in calling Richey as a mitigation witness

petitioner's counsel was under the mistaken belief that the unfavorable character evidence would not be admissible on cross-examination. We agree with the special masters' finding that there was "nothing improper in the conduct of the Examiners, nor anything in this incident to suggest bias on their part." As the special masters explained: "If there is any risk that the incident described by Richey might affect [petitioner] adversely, that risk was created by [petitioner's counsel's] decision to put Richey on as a character witness despite the concern he had expressed to [petitioner's] counsel that his direct examination might lead to the disclosure of the bad experience on cross-examination." Accordingly, we reject petitioner's contention that the Commission's attorneys "ambushed" him by not providing Coupe's notes of his conversation with Richey before the start of the hearing before the special masters.

Finally, petitioner argues that "the Commission's recommendation of public censure and its stated decision to 'limit' the value of mitigation evidence was an impermissible reaction to [his] vigorous legal defense in these proceedings." In support of his contention, petitioner cites the Commission's comment that he refused "to accept any responsibility for his conduct."[7] We reject petitioner's claim. Petitioner has not shown that the Commission penalized him for presenting a vigorous defense. Rather, the Commission's comment indicates that the Commission based its recommendation of public censure in part on petitioner's lack of remorse, as shown by his unwillingness to accept responsibility for clearly established misconduct such as "tricking" the defendant in People v. Hooks into waiving time for sentencing. (See In re Lewallen (1979) 23 Cal.3d 274, 281 [152 Cal.Rptr. 528, 590 P.2d 383, 100 A.L.R.3d 823] [trial court may not increase sentence in criminal case because the defendant refused a plea bargain but may consider information that came to court's attention during or after trial].) Lack of remorse is a relevant consideration in judicial discipline (see, e.g., Gonzalez v. Commission on Judicial Performance, supra, 33 Cal.3d 359, 377), in attorney discipline (see, e.g., Kapelus v. State Bar (1987) 44 Cal.3d 179, 197 [242 Cal.Rptr. 196, 745 P.2d 917]), and in criminal sentencing (see, e.g., Cal. Rules of Court, rules 414(b)(7), 423(b)(3)).

## V. DISCIPLINE

"In making our independent determination of the appropriate disciplinary sanction, we consider the purpose of a Commission disciplinary

---

[7]Petitioner further asserts that the Commission's statement that he refuses to accept any responsibility for his conduct is factually inaccurate because he did admit violating former canon 3A(6), prohibiting public comment on pending cases. Although he admits violating the canon, he does so in the context of his contention that the canon has no force because it is unconstitutional, a claim we rejected in part III.B.4., ante.

proceeding—which is not punishment, but rather the protection of the public, the enforcement of rigorous standards of judicial conduct, and the maintenance of public confidence in the integrity and independence of the judicial system." (*Adams* v. *Commission on Judicial Performance* (1995) 10 Cal.4th 866, 912 [42 Cal.Rptr.2d 606, 897 P.2d 544].)

 For the reasons given above, we conclude that in "tricking" defendant Hooks and his counsel into waiving time for sentencing, petitioner engaged in *willful misconduct in office*,[8] and that he engaged in *prejudicial conduct* when he attempted to influence the outcome of the civil action against Attorney Arthur Kralowec and when he publicly commented on the *Johnson* and *Zaring* cases while they were pending. We agree with the Commission that the appropriate discipline is public censure.

Petitioner insists that public censure is inappropriate because there were "abundant mitigating factors" presented through the testimony of 20 witnesses who described petitioner as industrious and innovative. Although such evidence may be taken "into account in considering the totality of the circumstances" (*Adams* v. *Commission on Judicial Performance, supra,* 10 Cal.4th at p. 912), it does not mitigate or excuse willful or prejudicial conduct (*ibid.*). The Commission did consider the evidence in mitigation, but it concluded that the seriousness of petitioner's misconduct warranted public censure, especially in light of his "refusal to accept any responsibility for his conduct."

According to petitioner, public censure in his case is improper because his misconduct is less egregious than that of judges publicly censured in previous cases. Proportionality review based on discipline imposed in other cases, however, is neither required nor determinative. The factual variations from case to case are simply too great to permit a meaningful comparison in many instances. "Choosing the proper sanction is an art, not a science, and turns on the facts of the case at bar." (*Furey* v. *Commission on Judicial Performance, supra,* 43 Cal.3d at p. 1318.)

In support of petitioner, the CJA argues against public censure because petitioner did not engage in repeated acts of misconduct. We disagree with the CJA that public censure is inappropriate in the absence of a pattern of repeated acts of misconduct. A level of discipline may be warranted either by the existence of a pattern of misconduct or by the seriousness of a single

---

[8]As discussed earlier, the Commission found petitioner's actions in the Hooks case to be prejudicial conduct rather than willful misconduct.

incident. (*Gubler* v. *Commission on Judicial Performance, supra,* 37 Cal.3d at p. 50 ["The fact that an act is an isolated incident does not preclude a determination of willful misconduct."]; see *Gonzalez* v. *Commission on Judicial Performance, supra,* 33 Cal.3d at p. 371.)

After careful consideration of the arguments by the Commission and by petitioner, we agree with the Commission's recommendation of public censure. In light of petitioner's lack of candor and integrity in obtaining the waiver in the Hooks case, his public comments on pending cases—in one instance *after* a written warning by the Commission that public comment on pending cases would violate former canon 3A(6)—and his attempt to influence the outcome of the civil proceeding against Attorney Arthur Kralowec, public censure is appropriate.

Accordingly, and by this order, Judge Broadman is publicly censured.

On September 2, 1998, the opinion was modified to read as printed above.