*CJP Supp. 113 Opinion
KAHN, Vice-chairperson.
This disciplinary matter concerns Judge John B. Gibson, a judge of the San Bernardino County Superior Court.
*CJP Supp. 114 Judge Gibson was appointed a judge of the Municipal Court of San Bernardino County, Victorville Division, in September 1990. As a result of consolidation of the San Bernardino trial courts in August 1998, he is now a judge of the superior court.
Formal proceedings in this matter commenced with the filing on December 10, 1998, of a notice of formal proceedings setting forth two counts. On January 29, 1999, Judge Gibson filed his verified answer.
As provided for by rule 121(b) of the Rules of the Commission on Judicial Performance, the Supreme Court appointed three special masters to conduct an evidentiary hearing and to prepare a written report. The evidentiary hearing was held in Santa Ana commencing June 1 and concluding June 7, 1999, before Justice J. Gary Hastings, presiding, of the Court of Appeal, Second Appellate District, Judge Michael Duffy of the Superior Court of San Luis Obispo County, and Judge Lillian Kwok Sing of the Superior Court of the City and County of San Francisco. The special masters filed their report to the commission on August 2, 1999.
Following the receipt of objections and briefs from Judge Gibson and the office of trial counsel, the matter was orally argued before the commission on December 7, 1999. Mr. Jack Coyle presented argument on behalf of trial counsel and Mr. Jerome Sapiro presented argument on behalf of Judge Gibson.
FINDINGS AND CONCLUSIONS
A. Count One
Count one charged Judge Gibson with three separate acts in connection with People v. Valenzuela and Payan, case No. FVI04899 (hereinafter Valenzuela).
The first charge was that on September 26, 1996, Judge Gibson dismissed Valenzuela out of animosity toward the district attorney’s office and that this violated the California Code of Judicial Ethics, canons 1 and 2A. Canon 1 states, “A judge should participate in establishing, maintaining, and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved.” Canon 2A states, “A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.”
The masters found that it was not proved by clear and convincing evidence that Valenzuela was dismissed by Judge Gibson out of animosity towards the *CJP Supp. 115 district attorney’s office. The masters found that Judge Gibson dismissed Valenzuela on September 26, 1996, when no one from the district attorney’s office appeared to prosecute the matter; however, the masters concluded that the dismissal was not in accordance with Judge Gibson’s normal custom and practice of having counsel present and placing the dismissal on the record.
The second charge was that on October 4, 1996, Judge Gibson had an ex parte communication with the supervising district attorney in which the attorney expressed his concern that Valenzuela had been dismissed vindictively. During this conversation, Judge Gibson allegedly denied acting vindictively and discussed the procedural facts of the case. This incident was charged as a violation of California Code of Judicial Ethics, canon 3B(7). Canon 3B(7) states that, except under specific circumstances, “A judge shall not initiate, permit, or consider ex parte communications, or consider other communications made to the judge outside the presence of the parties concerning a pending or impending proceeding.”
The masters found that Judge Gibson did have an ex parte communication with the supervising district attorney, and they also found that the attorney initiated the communication. The masters concluded that the communication was improper, but under all of the relevant circumstances, the communication did not rise to the level of “willful misconduct” or “prejudicial conduct.”
The third charge was that at a hearing before Judge Robert Law on February 21, 1997, Judge Gibson testified untruthfully under oath regarding the dismissal of the Valenzuela case, in that he testified that he had not dismissed the Valenzuela case on September 26, 1996. This conduct was alleged to have violated California Code of Judicial Ethics, canons 1 and 2. As noted above, canon 1 states, “A judge should participate in establishing, maintaining, and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved.” The several provisions of canon 2 are directed toward the need for a judge to avoid impropriety and the appearance of impropriety in all of the judge’s activities. In particular, canon 2A (as also noted above) states, “A judge shall respect and comply with the law and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.”
The masters found that the commission failed to prove by clear and convincing evidence that Judge Gibson had testified that he had not dismissed the Valenzuela case on September 26, 1996, as alleged, and therefore concluded that the commission had not sustained its burden of proof that Judge Gibson testified untruthfully or committed perjury at the February 21, 1997 hearing.
*CJP Supp. 116 After carefully reviewing the record, the briefs and the arguments of counsel, the commission adopts the masters’ findings on count one. The commission concludes that these findings do not warrant the imposition of discipline.
B. Count Two
Count two alleged that between December 1990 and September 1993, Judge Gibson engaged in a pattern of inappropriate conduct in the workplace toward female court employees, in violation of the former Code of Judicial Conduct, canons 1, 2A and 3B(5). Former canon 1 stated, “A judge should participate in establishing, maintaining and enforcing high standards of conduct, and shall personally observe those standards so that the integrity and independence of the judiciary will be preserved.” Former canon 2A stated, “A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.” Former canon 3B(5) stated, “A judge should perform judicial duties without bias or prejudice. A judge should not, in the performance of judicial duties, by words or conduct, manifest bias or prejudice, including but not limited to bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation, or socioeconomic status.” The commentary to canon 3B(5) stated, “A judge must refrain from speech, gestures, or other conduct that could reasonably be perceived as sexual harassment.”
Eight separate acts of inappropriate conduct were identified. Six of the acts relate to Joan Huntsman, a supervisor in the Victorville Municipal Court who worked closely on a daily basis with Judge Gibson on administrative matters, and two relate to other court employees.
The masters found that Judge Gibson and Ms. Huntsman met each other when Judge Gibson worked as a deputy in the San Bernardino District Attorney’s Office and Ms. Huntsman was a clerk in the Victorville branch of the municipal court. Ms. Huntsman had a good sense of humor and a casual, “joking” relationship developed between Ms. Huntsman and then Deputy District Attorney Gibson. Unfortunately, this relationship continued after Judge Gibson took the bench, and led to several of the following incidents.
(1) In response to a memo from Ms. Huntsman suggesting that they meet to discuss administrative matters, Judge Gibson wrote a memo that reads as follows:
“I have received your memo of September 4, 1991. I can’t imagine anything that would please me more than implementing new procedures with you. Naturally I would consider it a great personal honor to implement you, *CJP Supp. 117 old or new. However, as you point out, my schedule is tight and I would attempt to squeeze you in, but we can forget about Mondays. Mondays are my meetings with the Royal Pelican Society and, as everyone knows, Monday Night Football must take priority over everything else. Tuesdays and Thursdays aren’t any good as anybody can tell you. That leaves us with Wednesdays and Fridays. Fridays would be good. Oh, I’m sorry, I forgot we were implementing new procedures. Fridays wouldn’t be a good day for that. Maybe we could work something out on Wednesday. No, can’t do Wednesday. That’s lunch with Judge Ashworth and Hodge. Its important I attend these lunches with them for often they discuss all of the new procedures they have been implementing with Francine, due to their close contact with her. Oh, well.
“In all seriousness, I would cancel all of the appointments to reverse my vasectomy to have a meeting with you to implement new procedures. Tell me when and where. Should you. actually desire to eat lunch I will have solid substance as opposed to mere coke.
“Love and Kisses,
“Buggs
“cc: Judge Anthony J. Piazza, Supervising Judge”
Ms. Huntsman testified that the memo was an unnecessary response to her memo for a meeting and that the suggestive sexual references were offensive to her. Judge Gibson testified that he did not intend any sexual innuendo in the memo. The masters found that Judge Gibson’s testimony on this issue was not credible. They found that the memo was an attempt at a joke within the context of the relationship Judge Gibson had developed with Ms. Huntsman and that a reasonable and objective person would consider the memo sexually suggestive. Judge Gibson, in hindsight, recognizes that he made a mistake in writing the memo.
(2) The masters found that Judge Gibson made the following comments in the presence of Ms. Huntsman and a friend of his: “Isn’t that the best looking pair of legs and ass you’ve ever seen?” The comment caused Ms. Huntsman to become embarrassed. The friend then said to Judge Gibson: “John, you’re a judge now. You shouldn’t be saying things like that.” Judge Gibson responded by saying, “I can say whatever I want to her.” In his testimony before the masters, Judge Gibson did not deny the initial statement or his response. Judge Gibson admitted that his statement went beyond his prior relationship with Ms. Huntsman and was improper.
(3) Ms. Huntsman testified that Judge Gibson on occasion made comments to Ms. Huntsman such as “Those are nice shoes you have on, and they—your *CJP Supp. 118 legs look very nice in them . . . ,” “That’s a beautiful blouse you have on. Do you have a slip on or a camisole?,” and “That’s nice material. I wish I could be that close to your skin.” Ms. Huntsman did not attribute any sexual innuendo or intent to these remarks; however, she testified that she was offended by these comments because she did not think that Judge Gibson was being sincere.
Judge Gibson admitted that on occasion he would compliment Ms. Huntsman on her clothing but denied any of the sexual innuendoes attributed to him.
The masters credited the testimony of Ms. Huntsman and not that of Judge Gibson. They found that the comments were consistent with the relationship that had developed before Judge Gibson became a judge and continued afterwards. The masters found that Judge Gibson had no intent to harass Ms. Huntsman and that she did not understand the remarks as sexual advances or as sexual harassment. Nevertheless, the masters found that the remarks were insensitive and inappropriate.
(4) In early 1992, Judge Gibson remarked to Ms. Huntsman that another female court employee’s nipples were showing through her sweater. The masters found that the clerk in question “was a fairly large woman who wore tight fitting clothing, oftentimes sweaters which would show her nipples.” Ms. Huntsman, the employee’s supervisor, testified that on one occasion Judge Gibson remarked to her that “he really enjoyed seeing [the employee] walk in the door with her light-colored sweater on and her 46DD bra and her nipples showing ... I really get excited when I see that.”
Judge Gibson denied that he made these statements. He testified that after seeing the employee earlier that morning, he spoke to Ms. Huntsman about the employee’s attire being not appropriate for the court.
The masters found that the comments attributed to Judge Gibson did occur, and that they were consistent with the nature of the relationship between Judge Gibson and Ms. Huntsman.
(5) Ms. Huntsman testified that on several occasions in 1991 and 1992 Judge Gibson tugged on Ms. Huntsman’s bra strap and on one occasion said words to the effect of “I’m an expert at undoing these.” Judge Gibson denied doing so and denied making any such statement.
The masters found that the incidents occurred, that they fell within the “joking” relationship between Judge Gibson and Ms. Huntsman, and that they were inappropriate.
*CJP Supp. 119 (6) Ms. Huntsman testified to the effect that on several occasions in 1991 and 1992, as Judge Gibson was in chambers, putting on his robe, he wiggled his fingers through his robe in the area of his groin and said to Ms. Huntsman, “Say hello to Mr. Bobo.”[1]
Judge Gibson’s testimony is quoted in the masters’ report as follows:
“Q. Who is Mr. Bobo?
“A. Thanks to the fact that you have too many people working for you, I can now answer that question.
“Q. Who is Mr. Bobo?
“A. I’m told by my attorney who had his paralegals go on the Internet, Mr. Bobo is one of those plastic blow-up clowns that has sand at the bottom of it. And if you strike it, it will rock back and then come to an upright position again. Until you told me that, I did not know.
“Q. Did you ever know that Bobo has a Spanish origin?
“A. You have too many people working for you. No I did not.
“Q. It means a boob, doesn’t it?
“A. So I’m told.
“Q. Do you use the word or the phrase ‘Mr. Bobo’ in reference to yourself?
“A. Yes.
“Q. What do you mean when you use ‘Mr. Bobo’ in reference to yourself?
“A. It’s a name that implies a comedic small, diminutive figure.
“Q. Round?
“A. I hadn’t thought of that. I suppose.
*CJP Supp. 120 “Q. Something that somebody beats on once in a while?
“A. No. I never gave it that punching bag analogy.
“Q. Did you ever say to Mrs. Huntsman in words or substance, ‘Say hello to Mr. Bobo’?
“A. Not in the context she’s put it. If I did something that stupid, I would refer to myself by that name. Like, ‘Mr. Bobo really blew that one.’
“Q. So you’d use it as a way of putting yourself down?
“A. Yes.
“Q. Did you ever stick your finger out of your robe when you were putting on your robe and say, ‘Say hello to Mr. Bobo’?
“A. No.
“Q. Did you ever do that in substance?
“A. I don’t follow you.
“Q. Did you ever say words to that effect and make such a gesture?
“A. No.”
The masters found that the incidents occurred and were totally within the character of the relationship between Ms. Huntsman and Judge Gibson. They found that Judge Gibson’s testimony on this issue was not credible and that the act was inappropriate.
(7) On January 30, 1992, Judge Gibson wrote a memo addressed to “Municipal Court Staff Victorville Division” entitled “Death of Joan Huntsman.” The memo included a reference to a court employee, indicated here as “Ms._,”[2] The body of the memo reads:
“I want to thank you for the unanimous vote to have Joan Huntsman put to death. I realize a question of this magnitude takes a great deal of time and thought. I am therefore very appreciate [yz'c] that the matter was decided within 15 seconds of its submission to you.
*CJP Supp. 121 “I want to especially thank those, who after the vote, came up with ways that Ms. Huntsman should be put to death. It appears there are two schools of thought. One requesting immediate and swift execution. Their thought seems to be the sooner she is gone the better. However, the second school of thought seems to favor a slow lingering death. Although I realize there may be an initial emotional gain from the latter course of conduct, it does mean she would be with us longer.
“Lastly, a special tip of the hat to the unique manner of execution that [Ms. __] devised for Ms. Huntsman. And to think we all thought they worked together.”
The masters found that Ms._discovered a copy of the memo on her desk on January 30, 1992, and had no idea where it had come from. She was offended and embarrassed that the memo mentioned her, especially because Ms. Huntsman was her supervisor. She confronted Judge Gibson and asked what he knew about the memo. In response, Judge Gibson appended a handwritten note to the memo which states: “I deny all responsibility for this memo—its all [Ms. _’s] fault.” This further embarrassed Ms._and she thereafter tried to avoid Judge Gibson.
At that time Ms. Huntsman had no knowledge of the memo or of the exchange between Ms._and Judge Gibson. There was no evidence that anyone else saw the memo or learned of the exchange between Judge Gibson and Ms. _ until years later. Judge Gibson testified that he had no recollection of writing the memo but that it was the type of memo he would have written as a joke.
The masters found that Judge Gibson did write the memo and that although it most likely was meant as a joke, it was inappropriate.
(8) In September 1993, a county probation officer who had worked in Judge Gibson’s courtroom decided to resign shortly after the birth of her son. She went around the courthouse saying farewell to her friends. She was visiting in Judge Gibson’s courtroom and sitting in the chair next to the bailiff when Judge Gibson came out of his chambers. He inquired whether it was true that she was resigning. When she said yes, he noted that she was no longer going to be a county employee. Judge Gibson then said, “So it doesn’t matter if I do this,” and he leaned over, grabbed the employee on both sides of her face and gave her a full kiss on the lips. He then returned to his chambers. Judge Gibson admitted this incident.
* * *
The masters concluded that all six incidents alleged in connection with Ms. Huntsman did occur and that they constitute “conduct prejudicial to the *CJP Supp. 122 administration of justice that brings the judicial office into disrepute.” The masters note in mitigation that there was no evidence that Judge Gibson acted this way with anyone other than Ms. Huntsman and that she encouraged “a less than professional relationship.” They also note that Judge Gibson recognizes that he should not have continued the relationship as before after he became a judge.
The masters also concluded that the “Death to Joan Huntsman” memo although most likely intended as a joke, was a poor joke made at the expense of court employees that caused offense and embarrassment. Judge Gibson’s actions constituted “prejudicial conduct” for which the masters found no mitigating factors.
Finally, the masters found that Judge Gibson’s unconsented-to kissing of the probation officer constituted prejudicial conduct. They note in mitigation that he admitted that the incident occurred, apologized to the probation officer (after she returned and demanded an apology), and admitted to the masters that his action was inappropriate.
The commission adopts the masters’ findings and conclusions on count two.
DISCIPLINE
The Supreme Court has indicated that the purpose of a commission disciplinary proceeding is not punishment, “ ‘but rather the protection of the public, the enforcement of rigorous standards of judicial conduct, and the maintenance of public confidence in the integrity and independence of the judicial system.’ ” (Broadman v. Commission on Judicial Performance (1998) 18 Cal.4th 1079, 1112 [77 Cal.Rptr.2d 408, 959 P.2d 715], citing Adams v. Commission on Judicial Performance (1995) 10 Cal.4th 866, 912 [42 Cal.Rptr.2d 606, 897 P.2d 544].)
There is no doubt that discipline is warranted for Judge Gibson’s completely unacceptable conduct. The California Constitution states that the commission may “censure a judge ... for action . . . that constitutes willful misconduct in office ... or conduct prejudicial to the administration of justice that brings the judicial office into disrepute,” and may “publicly . . . admonish a judge . . . found to have engaged in an improper action or dereliction of duty.” (Cal. Const., art. VI, § 18, subd. (d).) The California Supreme Court has made it clear, however, that censure should not be imposed for every instance of prejudicial conduct. (Dodds v. Commission on Judicial Performance (1995) 12 Cal.4th 163, 178-179 [48 Cal.Rptr.2d 106, 906 P.2d 1260].) Public admonishment was introduced as a form of discipline by *CJP Supp. 123 Proposition 190, which took effect in 1995. Although the court has not yet directly addressed the question of conduct that warrants public admonishment, the court has stated that mitigating factors can properly lead to the imposition of a lesser sanction than censure, even when the requirements for censure are otherwise met. (Broadman, supra, 18 Cal.4th at p. 1112.)
In determining whether to impose censure or public admonishment, the commission has generally considered the nature and impact of the misconduct at issue. A review of the commission’s public admonishments since 1995 makes clear that the existence of mitigating factors weighs heavily in the commission’s decisions to impose public admonishment rather than censure.
The commission concludes that under all the circumstances in this matter, a public admonishment is appropriate for Judge Gibson’s prejudicial conduct with regards to Ms. Huntsman, another court employee, and a county probation officer. Public admonishment, rather than public censure, is appropriate despite the number of incidents because Judge Gibson’s actions occurred in the early ’90’s during his first years on the bench, and for the most part, concerned a single court employee, Ms. Huntsman, with whom he had a unique “joking” relationship. Judge Gibson recognizes that it was his responsibility to establish a professional relationship with Ms. Huntsman once he became a judge and that he failed to do so.
The commission believes that several circumstances mitigate the risk of further violations by Judge Gibson of the sort proved in this matter. First, the vast majority of the incidents involved Ms. Huntsman, with whom Judge Gibson had an unusual relationship. Second, Judge Gibson has recognized his responsibility for his mistakes and has apologized for his actions. Third, the events in question all occurred over six years ago, when Judge Gibson was new to the bench; no subsequent similar conduct has been reported in the interim. Fourth, the commission has before it considerable character evidence attesting to Judge Gibson’s exemplary behavior over the last six years. Furthermore, Judge Gibson has already suffered (to use his counsel’s words) the “public humiliation” of the widespread publicity of these embarrassing incidents.
In addressing charges such as those brought against Judge Gibson by Ms. Huntsman, the commission would ordinarily be concerned that an aggrieved party might face continuing unacceptable conduct or would lack access to remedies other than those provided by the commission. Because Ms. Huntsman had no professional contact with Judge Gibson after 1993, and *CJP Supp. 124 because Ms. Huntsman was availing herself of civil remedies, these concerns did not arise in connection with this matter.[3]
This decision shall constitute the order of public admonishment of Judge Gibson.
Commission members Michael A. Kahn, Esq., Judge Madeleine I. Flier, Ms. Crystal Lui, Judge Rise Jones Pichon, Ms. Ramona Ripston, and Ms. Julie Sommars voted in favor of public admonishment. Commission members Justice Daniel M. Hanlon, Ms. Lara Bergthold, Mr. Mike Farrell and Patrick M. Kelly, Esq. favored a public censure for Judge Gibson’s lack of candor.

 At oral argument on December 7, 1999, a joint request to consider additional evidence was granted. One of the items of additional evidence was a declaration from a former court employee who stated that one afternoon in 1991 she saw Judge Gibson in his robe in the hallway stick his finger out of the opening in front of his robe, below waist level, and say, “Say hello to Mr. Bobo.”

 “Ms._” is identified in the masters’ report. Her identity is irrelevant to our decision, as are the identities of certain other individuals who are mentioned herein. We have omitted their names in order to spare them further embarrassment.

 The commission believes that it should explain the staleness of the count two allegations, which deal with events that occurred between December 1990 and September 1993, long before charges were brought before the commission. The masters found that by 1992 Ms. Huntsman was aware of her option to report her complaints about Judge Gibson to the commission. In fact, however, charges were not brought until 1995; when they were brought, it was under the following circumstances: The masters found that in 1993, Ms. Huntsman was transferred from the Victorville branch by her supervisors, and that no evidence suggested any further professional contact between Judge Gibson and Ms. Huntsman after her transfer. By 1995, Ms. Huntsman had been terminated from her position and was approached by an employee of the clerk’s office who asked Ms. Huntsman to speak with her attorney. The employee was contemplating litigation at that time. After speaking with Ms. Huntsman, the attorney sent a complaint to the commission on behalf of Ms. Huntsman with regard to Judge Gibson’s conduct during 1991 and 1992. Furthermore, in 1996 Ms. Huntsman filed a civil suit against Judge Gibson and others.