*CJP Supp. 3 Opinion
McCONNELL, Chairperson.
I
INTRODUCTION AND SUMMARY
This disciplinary matter concerns Judge Joseph W. O’Flaherty, a judge of the Placer County Superior Court. The Commission on Judicial Performance commenced this inquiry with the filing of its notice of formal proceedings (Notice) on February 3, 2010. The Notice charges Judge O’Flaherty with disregard of the law, abuse of authority, embroilment and denial of due *CJP Supp. 4 process. It alleges that the misconduct occurred during a court proceeding in which the judge issued a no-contact order without following any of the applicable procedural requirements and without affording plaintiff notice or an opportunity to be heard.
The Supreme Court appointed three special masters who held an evidentiary hearing and reported to the commission. The masters are Hon. Stephen J. Kane, Associate Justice of the Court of Appeal, Fifth Appellate District, Hon. Larry W. Allen, Judge of the San Bernardino County Superior Court, and Hon. Allan D. Hardcastle, Judge of the Sonoma County Superior Court. Judge O’Flaherty is represented by James A. Murphy of Murphy, Pearson, Bradley & Feeney in San Francisco, California. The examiners for the commission at the hearing before the special masters were Commission Trial Counsel Andrew Blum and Assistant Trial Counsel Valerie Marchant.[1] At the oral argument before the commission, commission attorney Charlene Drummer served as the examiner.
A two-day evidentiary hearing was held in Sacramento on April 27 to 28, 2010. The masters’ report to the commission containing their findings of fact and conclusions of law was filed on June 30, 2010. An oral argument before the commission was heard in San Francisco on August 25, 2010.
The masters concluded that Judge O’Flaherty engaged in willful misconduct, the most serious form of judicial misconduct, through his intentional disregard of the law, abuse of authority, embroilment, and failure to afford a litigant his right to be heard. Based on our independent review of the record we agree. Judge O’Flaherty ordered a small claims plaintiff to have no contact with three women and to stay away from a credit union without complying with any of the procedural requirements for the issuance of a restraining order and without affording the person who was the subject of the order notice or an opportunity to be heard. As did the masters, we reject Judge O’Flaherty’s contention that his actions were justified and necessary to address an emergency situation brought on by the plaintiff’s harassing and intimidating conduct toward the women. Having observed the videotape of the subject proceedings and reviewed the entire record of the hearing before the special masters, we unequivocally concur with the masters’ finding that the evidence does not support the assertion that the plaintiff, directly or indirectly, abused, threatened or intimidated the women during the court proceeding or at any previous time. Judge O’Flaherty issued the no-contact *CJP Supp. 5 order based on the comments and reaction of the women after plaintiff left the courtroom. The women had not filed a petition for a restraining order or described any conduct by plaintiff which would constitute proof of threats or harassment justifying the issuance of a restraining order. Judge O’Flaherty was familiar with the procedural requirements for issuance of a restraining order and knew that he was not complying with those requirements when he issued the no-contact order.
This is not the first time Judge O’Flaherty has abused his authority and failed to be faithful to the law. In 2004, he was publicly admonished for misconduct that involved disregard of the law and abuse of authority. Despite his prior discipline and the unanimous conclusion of three special masters that he committed willful misconduct in the present case, Judge O’Flaherty insists that his actions do not amount to misconduct. Judge O’Flaherty’s continued failure to accept the inherent obligation of a judge to adhere to the law and the limits of judicial authority convinces us that he should be publicly censured. As we stated in Judge O’Flaherty’s 2004 public admonishment, “ ‘The public expects and embraces the concept that a judge shall be faithful to the law. This is so fundamental to a system of justice that it serves as a basic cornerstone of public confidence.’ ” (Inquiry Concerning O’Flaherty (2004) 49 Cal.4th CJP Supp. 1, 25, quoting from the special masters’ report.)
n
FINDINGS OF FACT AND CONCLUSIONS OF LAW
A. Findings of Fact
The examiner has the burden of proving the charges by clear and convincing evidence. (Broadman v. Commission on Judicial Performance (1998) 18 Cal.4th 1079, 1090 [77 Cal.Rptr.2d 408, 959 P.2d 715] (Broadman).) “Evidence of a charge is clear and convincing so long as there is a ‘high probability’ that the charge is true.” (Ibid.) Factual findings of the masters are entitled to great weight because the masters have “the advantage of observing the demeanor of the witnesses.” (Ibid.; see Inquiry Concerning Freedman (2007) 49 Cal.4th CJP Supp. 223, 230-232.)
We adopt the masters’ factual findings in their entirety, with one minor exception as discussed below. Based on our own independent review of the *CJP Supp. 6 record, we have determined that the following factual findings are supported by clear and convincing evidence.
1. Findings Concerning the Hearing Before Judge O’Flaherty
Judge O’Flaherty has been a trial judge in Placer County for approximately 20 years.
On December 8, 2008, Judge O’Flaherty presided over the small claims matter of Herold v. Golden 1 Credit Union (Super. Ct. Placer County, No. RSC13621). Herold, an independent car dealer, alleged that an employee of Golden 1, Cynthia Rapozo, made derogatory remarks about independent car dealers which caused Bonnie Davis to break a contract with him for the sale of a car. The comments were allegedly made on May 6, 2008, when Herold and Davis went to the credit union together to obtain financing for Davis. In attendance at the small claims hearing were Herold, Davis, Rapozo, and Melissa Burgess, a supervisor at Golden 1.
Herold commenced his presentation by reading from a prepared statement. Before he finished his first sentence, Judge O’Flaherty interrupted him and told him that he should tell it in his own words. As Herold attempted to explain what happened without the use of his notes, Judge O’Flaherty interrupted him numerous times with questions and comments generally critical of Herald’s defamation claim. In contrast to Herold, Davis was allowed to give a lengthy narrative without interruption. After hearing from both Rapozo and Burgess, the judge told Herold that his defamation case against the credit union “isn’t even close to a libel.” Herold responded that the witnesses were not telling the truth and would have to “sleep with it at night.” Judge O’Flaherty responded, “See . . . how you’re getting emotional? You were getting emotional—.” Herold denied being emotional. He said he knew he was 100 percent right regardless of what the judge decided, so “whatever decision you make, great ... I mean life goes on. Tomorrow’s another day.” Judge O’Flaherty responded, “If that’s the way you want it.” Herold stated: “You tell me I can’t prove my case, but you won’t even let me. Three months. I can’t even tell you my whole story and, you know,... so it’s fine. I got my $100 satisfaction and lost business. I’m satisfied now. Okay? You can dismiss the case. I mean that’s—I just feel . . . .” Judge O’Flaherty then dismissed the case and Herold walked out of the courtroom.
Immediately after Herold left the courtroom, Davis, Rapozo and Burgess conversed among themselves. Davis said, “He’s got my address.” Rapozo started crying and expressed concern that Herold would “come after” her. She *CJP Supp. 7 said, “This guy’s a lunatic” and “I’m scared of that man . . . .” Rapozo said, “He’s come back in and tried to confront me before.” Davis stated that she received a “demand letter from him.” Burgess and Davis attempted to console Rapozo. Although none of these comments was made directly to Judge O’Flaherty, he overheard them. He ordered the bailiff to return Herold to the courtroom.
When Herold returned, the following exchange took place:
“COURT: All right. Now, I’m a little bit concerned about you. I think frankly, I’m going to put it bluntly. I think you’ve been abusing these people, and I don’t like it. And these women are all three of you [sic] afraid of you. Now I’m going to tell you this. I’m not going to issue a formal restraining order which I have the right to do. If there’s any contact between you and these three people in the next few months, then I will issue a formal restraining order on the spot and you will have to pay the fees and then if you violate that restraining order, then it’s a criminal case. Do you understand that?
“HEROLD: I do, Your Honor.
“COURT: There is to be no contact with them.
“HEROLD: I understand.
“COURT: I really—after you left I did not like their reaction at all. For whatever reason, they’ve made—you’ve made them afraid of you and I’m not going to have that. You understand?
“HEROLD: I understand. I’m not a violent person. It’s just—
“COURT: You are to have no contact with them whatsoever. Whatever you’ve done and I’ve listened to this and bluntly, frankly, you’re light years away from having a case against anybody. To put it—and I really didn’t like—because I can gather from these three people, these two people are business people. Their job is to satisfy people. And you’ve gotten to the point that they’re afraid of you. And frankly, that’s not going to happen when I’m concerned. Do you understand that?
“HEROLD: I understand it, Your Honor.
“COURT: Well, I hope you’re right.
“HEROLD: I’m also a customer of Golden 1 Credit Union too, so what does that mean, I can’t do—
*CJP Supp. 8 “COURT: You will have no contact with any of these three people. [Addressing Golden 1] What do you want to do about that?
“HEROLD: Does that mean I got to pull my accounts out of Golden 1—
“COURT: What do you want to do about that? You don’t want to do that, right?
“BURGESS: Right. I think that if he just stays away from our branch—
“COURT: Stay away from their branch. You can have contact with other branches. Do you know—which branch is it?
“BURGESS: Roseville on Douglas Boulevard.
“COURT: Are there other branches in the area?
“BURGESS: Not in this area—
“COURT: How about Sacramento?
“BURGESS: There are branches in Sacramento and on the west side of Roseville.
“COURT: Oh, okay. You will not have—what street are you on?
“BURGESS: Santa Clara Drive.
“COURT: You will not have any contact in the Santa Clara branch for at least the next 90 days. Do you understand that?
“HEROLD: I understand that 100%.
“COURT: All right. Good luck, sir.
“HEROLD: Thank you very much.”
When Herold went to the clerk’s office the next day, December 9, 2008, to inquire about the restraining order, the clerk was unable to provide any information because the file had not been returned to the main courthouse. Approximately 20 days later, Herold learned there was no restraining order against him.
*CJP Supp. 9 The minutes of the small claims proceeding include the following handwritten note under a heading that reads “THE COURT MAICES THE FOLLOWING ORDERS”: “Golden One is dismissed from action . . . plaintiff to have no contact with defendants or restraining order will be issued. Plaintiff is to stay away from Santa Clara Drive branch for 90 days.”
In his answer to the Notice, Judge O’Flaherty asserted that he did not review these minutes until after he was contacted by the commission. The masters found Judge O’Flaherty reviewed the minutes on the day of the small claims hearing. This finding is based on the judge’s testimony that he initialed the second page of the document that was admitted as the minutes/judgment of the proceedings on the day of the hearing. We do not adopt this finding. In the commission’s view, there is not substantial evidence to establish that Judge O’Flaherty reviewed the first page of the minute order with the aforementioned no-contact order at the time he initialed the second page of the document.
2. Findings Concerning Evidence of Threats or Intimidation
The masters found that “Herold did not, directly or indirectly, abuse, threaten or intimidate these women on December 8 or at any previous time.” Judge O’Flaherty contends that there was substantial evidence presented from multiple witnesses that Herold engaged in intimidating and threatening behavior both before and during the small claims hearing. However, the masters, who were in a position to observe the demeanor of the witnesses, view the actual proceeding on videotape and consider the totality of the evidence, rejected those witnesses’ characterization of Herold’s demeanor. The masters state: “The aggregate testimony of O’Flaherty, Davis, Hanson (court clerk), and Gutierrez (courtroom deputy) describes Herold as emotional, acrimonious, angry, intimidating and threatening. Those characterizations of his demeanor and language are not supported by the evidence. Nor does the evidence support the assertion that Herold ‘stormed out of the courtroom’ to the extent that it is meant to say that he walked out loudly or angrily. He was displeased and frustrated, but he never raised his voice, displayed anger or made any threats, directly or indirectly. He did display his frustration to the extent he tossed or dropped what appeared to be a day planner on the table in front of him, but it was not done in an angry manner. O’Flaherty testified that up until Herold left the first time, the level of acrimony at the hearing was within the normal range of small claims hearings.”
*CJP Supp. 10 Based on our own viewing of the videotape and consideration of all the evidence presented at the hearing before the special masters, we concur with these findings. Herold displayed restraint and composure in the face of the judge’s frequent interruptions of his presentation and repeated comments disparaging his case. We observe, as did the masters, that “at no time during the court proceedings did Herold by words, expression, conduct or body language, demonstrate an intimidating or threatening manner to anyone.” Contrary to the judge’s testimony that Herold sat close to Davis as an intimidating tactic, the videotape shows Herold separating his chair from the others at the outset of the hearing. Herold remained calm even after being unexpectedly returned to the courtroom and greeted with the judge’s stem rebuke, “I think you’ve been abusing these people, and I don’t like it.”
Judge O’Flaherty contends that Herold had engaged in intimidating and threatening behavior towards the women prior to the small claims hearing. As did the masters, we find that the evidence does not substantiate this claim. We concur with the masters’ finding that while Rapozo appeared upset when Herold left the courtroom the first time, neither Davis nor Burgess displayed any signs of personal distress or fear. Rapozo made statements to the other women that she was afraid that Herold would “come after” her because he had “tried to confront” her before. However, Judge O’Flaherty made no inquiries to determine the circumstances of Herald’s return to the credit union or whether Rapozo’s fear was objectively reasonable and justified.[2] The masters found that none of the comments made by defendants “describe^] any conduct by Herold that would constitute a harassing course of conduct.” We agree.
Judge O’Flaherty’s reliance on Davis’s statement that she received a letter from Herold demanding payment of $2,000 for breach of contract as evidence of intimidation is misplaced. Far from being a tactic of intimidation, a plaintiff is required, where possible, to demand payment from the defendant prior to filing a small claims action. (Code Civ. Proc., § 116.320, subd. (b).)[3] Moreover, at the hearing before the masters, Davis testified that Herold had *CJP Supp. 11 not threatened her verbally or in writing, and that she did not feel intimidated by Herold at the small claims hearing.
Judge O’Flaherty’s reliance on Herold’s statement that he sued Davis “to get her to come in” as evidence that Herold was intimidating Davis is also misguided. Herold testified that his attorney recommended that he “sue both of them [Golden 1 and Davis]” to get Davis into court “instead of approaching her.” He also testified that he sued her because she broke the contract to purchase the car. Herold exercised his right to sue a party who he believed had breached a contract—this does not constitute evidence of intimidation.
3. Findings Concerning Issuance of an Order
The masters found that Judge O’Flaherty’s statements and conduct after Herold was returned to the courtroom “establish beyond a doubt” that he ordered Herold not to have contact with the three women for 90 days. We are in complete agreement. Judge O’Flaherty told Herold in no uncertain terms at least six times that he was to stay away from the women, specified the amount of time the order was in effect, and repeatedly asked Herold if he understood what he was being told.
Judge O’Flaherty is adamant that he did not issue and did not intend to issue a no-contact order against Herold. Relying heavily on his initial comment to Herold that he was not going to issue a “formal restraining order,” the judge maintains that he was simply issuing a warning and attempting to obtain Herold’s “agreement” to stay away from the women rather than issuing a court order. The precise words he refers to are, “I’m not going to issue a formal restraining order which I have the right to do. If there’s any contact between you and these three people in the next few months, then I will issue a formal restraining order on the spot and you will have to pay the fees and then if you violate that restraining order, then it’s a criminal case.” Judge O’Flaherty acknowledges that the law does not authorize the issuance of “informal” restraining orders and that a restraining order could not be issued “on the spot” if Herold had contact with the women.
More importantly, Judge O’Flaherty’s subsequent statements establish that he was ordering Herold to have no contact with the women rather than seeking an agreement: “There is to be no contact with them”; “You are to have no contact with them whatsoever”; “You will have no contact with any of these three people”; “Stay away from their branch”; “You will not have any contact [with] the Santa Clara [Drive] branch for at least the next 90 days.” The judge asked Herold several times if he understood what he was *CJP Supp. 12 being told. After the last command, Herold indicated that he “underst[oo]d that 100%” and left the courtroom. Judge O’Flaherty then told the women to let him know immediately if Herold had any contact with them.
There is no reasonable way to interpret the judge’s words other than as an order. At no time was Herold asked if he would agree to stay away from the women, nor told that he was just being given a warning. As Special Master Hardcastle said during closing argument before the special masters, “It doesn’t sound to me like there’s a negotiation going on. It sounds to me like this is a command.”
The masters found that Herold subjectively believed that the judge’s words and tone meant that he was under a court order not to have any contact with the women, and that Herold’s belief was objectively reasonable. We agree.
Judge O’Flaherty concedes that his words may have given the appearance that he was issuing an order, but insists this was not his intent. We find that Judge O’Flaherty’s unequivocal choice of words and emphatic tone of voice while speaking to Herold manifest his intent to issue a no-contact order, or at least to “bluff” Herold into believing he was under such an order. Significantly, Judge O’Flaherty testified that he was essentially bluffing Herold into believing that a restraining order with resulting fees and possible criminal proceeding would issue “on the spot” if he had any contact with defendants. We have no doubt that Judge O’Flaherty wanted Herold to believe he was subject to a restraining order, an order the judge knew he did not have authority to issue.
The issuance of a temporary restraining order requires the filing of an affidavit by the person requesting the order showing reasonable proof of harassment as defined by statute,[4] and that great or irreparable harm would result to the person being harassed. Judge O’Flaherty was aware of the statutory requirements for issuance of a restraining order based on his extensive experience handling harassment petitions. Thus, he knew that he did not have authority to issue a no-contact order based only on the women’s *CJP Supp. 13 statements after Herold left the courtroom, or “on the spot” if Herold had contact with the women during the next 90 days.
4. Findings Concerning Embroilment and Due Process Violation
The masters found that while it was not inappropriate under these circumstances for Judge O’Flaherty to have Herold brought back to the courtroom to address Rapozo’s fear, his subsequent conduct demonstrated a lack of impartiality and embroilment. We concur. “Embroilment is the process by which the judge surrenders the role of impartial factfinder/decisionmaker, and joins the fray.” (Rothman, Cal. Judicial Conduct Handbook (3d ed. 2007) § 2.01, p. 37.) As the masters found, “[0]nce Herold was returned to the courtroom, O’Flaherty’s conduct and statements demonstrated that, rather than acting as an impartial jurist, he became a forceful advocate for the women and became embroiled in the matter to the extent that he issued orders that were neither requested nor legally proper.”
The masters also found that “Herold was denied basic due process rights during the second hearing [after his return to the courtroom].” We agree. Herold was not present when the women made comments that caused Judge O’Flaherty to order his return to the courtroom. When Herold returned, the judge did not inform him of the factual basis for the no-contact order except to say that the women were fearful of him [“For whatever reason, they’ve made—you’ve made them afraid of you and I’m not going to have that.”]. Herold was not afforded an opportunity to ask questions or to respond to the accusation that he had harassed the women. As Herold attempted to explain that he is not a violent person, he was interrupted by Judge O’Flaherty, who told him he was to have “no contact with them whatsoever . . . you’re light years away from having a case against anybody . . . they’re afraid of you. . . .”
5. Prior Discipline
Judge O’Flaherty was publicly admonished in 2004 for telling prospective jurors in two criminal trials that they could lie to get out of jury duty if they thought they might be racially biased.
B. Conclusions of Law
The masters concluded that Judge O’Flaherty engaged in willful misconduct. We reach the same conclusion.
*CJP Supp. 14 Willful misconduct is (1) unjudicial conduct that is (2) committed in bad faith (3) by a judge acting in his judicial capacity. (Broadman, supra, 18 Cal.4th at p. 1091.) That Judge O’Flaherty was acting in his judicial capacity is not in dispute.
Failure to comply with the California Code of Judicial Ethics canons of judicial ethics is generally considered to constitute unjudicial conduct. (Adams v. Commission on Judicial Performance (Adams) (1994) 8 Cal.4th 630, 662 [34 Cal.Rptr.2d 641, 882 P.2d 358].) We conclude, as did the masters, that Judge O’Flaherty violated canons 1 (a judge shall uphold the integrity of the judiciary), 2A (a judge shall respect and comply with the law), 3B(2) (a judge shall be faithful to the law), and 3B(7) (a judge shall accord every person who has a legal interest in the proceeding the right to be heard) of the California Code of Judicial Ethics in that he abused his authority, disregarded the law and denied a person who had a legal interest in proceedings before him the right to be heard. As such, his conduct was unjudicial.
A judge acts in bad faith “only by (1) performing a judicial act for a corrupt purpose (which is any purpose other than the faithful discharge of judicial duties), or (2) performing a judicial act with knowledge that the act is beyond the judge’s lawful judicial power, or (3) performing a judicial act that exceeds the judge’s lawful power with a conscious disregard for the limits of the judge’s authority.” (Broadman, supra, 18 Cal.4th at p. 1092.) Judge O’Flaherty acted in bad faith because he issued a no-contact order with knowledge that it was beyond his judicial authority to do so and because he acted with a conscious disregard for the limits of his authority.
Judge O’Flaherty contends that he did not act in bad faith because he did not intend to issue a no-contact order. As previously discussed, we reject the judge’s characterization of his comments as a “good-faith misstatement” during an emergency situation and find that his intent was to order rather than warn Herold to stay away from the three women. While we defer to the masters’ finding that the judge did not act for a corrupt purpose, this does not mean he did not act in bad faith. Bad faith in this context does not require a corrupt purpose. (Broadman, supra, 18 Cal.4th at p. 1092.) Judge O’Flaherty acted in bad faith by consciously disregarding the limits of his judicial authority regardless of his motivation.
Judge O’Flaherty’s contention that he acted in good faith because he believed his actions were a necessary response to an emergency situation is misguided. The law provides an expedited process for the issuance of temporary restraining orders, a process Judge O’Flaherty failed to follow. (Code Civ. Proc., § 527.6, subd. (c).) Judge O’Flaherty acknowledged that a *CJP Supp. 15 temporary restraining order can be issued “very fast.” Had there actually been an emergency situation, the judge’s unenforceable no-contact order would have provided no protection to the women.
We do not suggest that Judge O’Flaherty was required to ignore the women’s comments after Herold left the courtroom. He could have told them, for instance, where to obtain forms for filing a petition for a restraining order without commenting on the merits of such a petition. What he could not do was issue a no-contact order without complying with applicable statutory requirements and constitutional due process guarantees. The power to restrict a person’s freedom of movement and contact with other individuals is a weighty responsibility which should be exercised with caution and in strict compliance with the law.
Ill
DISCIPLINE
We now reach the ultimate question of the appropriate discipline to be imposed. After careful consideration, we have determined to publicly censure Judge O’Flaherty.
Crucial to our determination is the fact that Judge O’Flaherty was previously publicly admonished for abusing his authority and disregarding the law and yet continues to show no acceptance or understanding of the limits of his authority. “A judge’s failure to appreciate or admit to the impropriety of his or her acts indicates a lack of capacity to reform.” (Inquiry Concerning Platt (2002) 48 Cal.4th CJP Supp. 227, 248; see also Fletcher v. Commission on Judicial Performance (1998) 19 Cal.4th 865, 920-921 [81 Cal.Rptr.2d 58, 968 P.2d 958]; Kloepfer v. Commission on Judicial Performance (1989) 49 Cal.3d 826, 866 [264 Cal.Rptr. 100, 782 P.2d 239].) Judge O’Flaherty insists that he did not engage in misconduct despite a unanimous report from three special masters which concludes that he engaged in willful misconduct and clearly and unequivocally explains the basis for that conclusion. When asked at oral argument before file commission whether he recognized any impropriety in his conduct, Judge O’Flaherty responded that he “misspoke to Herold” which he described as a mistake rather than misconduct. In order to justify his own conduct, he continues to characterize Herold’s conduct and demeanor during the court proceeding in a manner that is inconsistent with the findings of the masters and the video recording of the proceedings. Our determination of the appropriate level of discipline might have been different if we were confident that Judge O’Flaherty understood and accepted the impropriety of his actions. (Inquiry Concerning Platt, at p. 248; see also Fletcher, at pp. 920-921; Kloepfer, at p. 866.) Unfortunately, he has made it clear that he does not.
*CJP Supp. 16 Judge O’Flaherty’s failure to acknowledge his wrongdoing is particularly troubling given his prior discipline. (See Inquiry Concerning Van Voorhis (2003) 48 Cal.4th CJP Supp. 257, 301-302; Doan v. Commission on Judicial Performance (1995) 11 Cal.4th 294, 339-340 [45 Cal.Rptr.2d 254, 902 P.2d 272]; McCullough v. Commission on Judicial Performance (1989) 49 Cal.3d 186, 199 [260 Cal.Rptr. 557, 776 P.2d 259] [failure to respond to prior discipline “evidences a lack of regard for the Commission, this court and his obligations as a judge.”].) We see a disturbing similarity between the misconduct that resulted in his 2004 public admonishment and his misconduct in the present case. In both cases, Judge O’Flaherty has demonstrated a willingness to circumvent the law in favor of procedures he considers more effective. In the case leading to his prior discipline, he believed he could tell jurors to lie under oath to get off the jury because he was concerned they would not be honest about their racial bias. (Inquiry Concerning O’Flaherty, supra, 49 Cal.4th CJP Supp. 1.) In the present case, he thought he was justified in issuing an unlawful no-contact order because the issuance of a lawful restraining order might trigger an investigation of Rapozo by the credit union and would have “onerous” collateral consequences to Herold. Judge O’Flaherty testified that he has given essentially the same “warning” he gave Herold in many other cases where there was no petition for a restraining order pending before him and “it usually works.” We note that in the case that led to his prior discipline, Judge O’Flaherty also maintained that his conduct should not be subject to discipline because his intentions were good. (Id. at p. 24.) It appears that Judge O’Flaherty believes he is entitled to disregard the law without consequence as long as, in his mind, the ends justify the means.
The impact of a judge’s misconduct on the litigants and judicial system is another important factor we consider. (Inquiry Concerning Van Voorhis, supra, 48 Cal.4th CJP Supp. at pp. 299-300.) Herold’s due process rights were violated and his freedom of association and movement unlawfully restricted. Further, Judge O’Flaherty’s misconduct adversely impacts the reputation of the judiciary. Abuse of judicial authority and conscious disregard of the law are the antithesis of what the public expects of a judge. The integrity of the judiciary depends on public confidence that judges will faithfully comply with the law and act within the bounds of their authority. Finally, intentionally bluffing a litigant manifestly diminishes public esteem for the judiciary.
The purpose of judicial discipline is the protection of the public, the enforcement of rigorous standards of judicial conduct, and the maintenance of public confidence in the integrity of the judiciary. (Broadman, supra, 18 Cal.4th at pp. 1111-1112.) For the foregoing reasons, we have determined that this purpose is best served through the imposition of a public censure.
*CJP Supp. 17 ORDER
Pursuant to the provisions of article VI, section 18 of the California Constitution, we hereby impose a public censure on Judge Joseph W. O’Flaherty.
Commission members, Hon. Judith D. McConnell, Hon. Katherine Feinstein, Mr. Anthony Capozzi, Mr. Peter E. Flores, Jr., Mr. Samuel Hardage, Hon. Frederick P. Horn, Ms. Barbara Schraeger, Mr. Lawrence Simi, Ms. Maya Dillard Smith, Ms. Sandra Talcott, and Mr. Nathaniel Trives voted in favor of all of the findings and conclusions expressed herein and in the foregoing order of a public censure.

Mr. Blum was appointed to the Lake County Superior Court after the hearing before the special masters.

During the small claims hearing, Herold mentioned that he had received a letter from the vice-president of Golden 1 and talked to managers at the branch. Whether these conversations took place in person or by phone and the subject of the conversations was not pursued. At the hearing before the special masters, Herold testified that he only returned to Golden 1 once after the incident and Rapozo was not present. He had a few conversations with the vice-president at Golden 1 and encouraged him to discipline Rapozo for making disparaging comments about independent car dealers. This was the only evidence presented concerning Herald’s contacts with employees at Golden 1, including Rapozo, after the incident that was the subject of the small claims proceeding.

Judicial Council of California mandatory form SC-100 (Plaintiff’s Claim and ORDER to Go to Small Claims Court) states: “You must ask the Defendant (in person, in writing, or by phone) to pay you before you sue.” (Boldface omitted.)

Harassment is defined as unlawful violence, a credible threat of violence, or a willful course of conduct that seriously alarms, annoys or harasses the person, and that serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the plaintiff. (Code Civ. Proc., § 527.6, subd. (b).)
Within 15 days, or, if good cause appears to the court, 22 days from the date the temporary restraining order is issued, a hearing must be held on the petition for injunction with notice to the defendant. (Code Civ. Proc., § 527.6.)