*CJP Supp. 4 Opinion
SIMI, Chairperson.
I
INTRODUCTION AND SUMMARY
This disciplinary matter concerns Judge Bruce Clayton Mills, a judge of the Contra Costa County Superior Court. The commission commenced this inquiry with the filing of its Notice of Formal Proceedings (Notice) on November 1, 2012. The Notice charges Judge Mills in a single count with engaging in judicial misconduct through his communications with a courtroom clerk and a pro tempore judge in nonpublic areas of the courthouse concerning his son’s scheduled court appearance on an order to show cause for failure to complete volunteer work ordered in a tobacco infraction case. The Notice alleges that the judge sought and received credit for time his son spent in a residential program in lieu of the required community service.
The Supreme Court appointed three special masters who held an evidentiary hearing and reported to the commission. The masters are the Honorable Dennis M. Perluss, Associate Justice of the Court of Appeal, Second Appellate District; the Honorable Gail A. Andler, Judge of the Orange County Superior Court; and the Honorable Vincent J. O’Neill, Jr., Judge of the Ventura County Superior Court. Judge Mills is represented by James A. Murphy, Esq., of Murphy, Pearson, Bradley & Feeney in San Francisco, California. The examiners for the commission are Gary W. Schons, Esq., and Valerie Marchant, Esq.
A three-day evidentiary hearing was held before the special masters commencing February 19, 2013, followed by oral argument on April 8, 2013.[1] The masters’ report to the commission, containing their findings of fact and conclusions of law, was filed on April 25, 2013. Oral argument before the commission was heard on June 26, 2013.
The masters found that Judge Mills communicated his desired disposition of his son’s case and showed supporting documents to the courtroom clerk in an area not accessible to the public and participated in a favorable *CJP Supp. 5 disposition of the matter in chambers with the pro tempore judge.[2] We adopt the factual findings of the masters. Based on these factual findings, we reach our own independent legal conclusion that Judge Mills engaged in prejudicial misconduct, which is unjudicial conduct prejudicial to public esteem for the judiciary. By allowing discussion and resolution of his son’s case to take place in nonpublic areas of the courthouse and outside the normal process, Judge Mills created an appearance of impropriety, that undermines public confidence in the impartiality and integrity of the judiciary. Moreover, the fact that both the courtroom clerk and the pro tempore judge were subordinate to the judge heightens the appearance and reality of impropriety. •
For reasons discussed in this decision, we conclude that the purpose of judicial discipline—protection of the public, enforcement of rigorous standards of judicial conduct, and maintenance of public confidence in the integrity and impartiality of the judiciary—can best be accomplished through the imposition of a public admonishment.
n
FINDINGS OF FACT AND CONCLUSIONS OF LAW
A. Findings of Fact
The examiner has the burden of proving the charges by clear and convincing evidence. (Broadman v. Commission on Judicial Performance (1998) 18 Cal.4th 1079, 1090 [77 Cal.Rptr.2d 408, 959 P.2d 715] (Broadman).) “Evidence of a charge is clear and convincing so long as there is a ‘high probability’ that the charge is true. [Citations.]” (Ibid.)
Factual findings of the masters are entitled to great weight because the masters have “the advantage of observing the demeanor of the witnesses.” (Broadman, supra, 18 Cal.4th at p. 1090; see Inquiry Concerning Freedman (2007) 49 Cal.4th CJP Supp. 223, 232 (Freedman).) We adopt the factual findings of the masters, which we have determined are supported by clear and convincing evidence.
The evidence presented at the hearing before the special masters concerned, for the most part, Judge Mills’s conduct surrounding his son’s scheduled court appearance at 1:30 p.m. on October 4, 2011, in Department 59 of the Walnut Creek courthouse to show proof of completion of volunteer *CJP Supp. 6 work in a tobacco infraction case. The son had not completed the volunteer work because he enrolled in a residential treatment program out of state shortly after his guilty plea. The disputed evidence involved Judge Mills’s communications before the scheduled hearing with Jane Sims, the clerk in Department 59, and Helen Peters, a pro tempore judge who was scheduled to preside in Department 59 that day. The conflicts in the testimony primarily concerned the number, location, and substance of the judge’s conversations with Ms. Sims. Most of the disputes in the evidence were resolved by the masters in accord with Judge Mills’s testimony based on the masters’ observation of the manner in which the witnesses testified and the extent to which the testimony was consistent or inconsistent with other evidence.
Judge Mills has no objections to the factual findings of the masters. The examiner “notes concern” as to one factual finding relevant to the masters’ credibility determination as discussed later in this decision.
In deference to the masters’ evaluation of the demeanor of the witnesses and based on our own independent review of the record, we adopt the following factual findings.
On March 2, 2011, Judge Mills appeared with his minor son in Department 59 for his son’s arraignment on a charge of possession of tobacco by a minor. Former Commissioner Joel Golub was assigned to Department 59. For more than a decade, Judge Mills and his ex-wife Judge Cheryl Mills[3] had' a strained relationship with Commissioner Golub. Shortly after taking office, Judge Mills recommended that Commissioner Golub be replaced. In 2002, Commissioner Golub unsuccessfully ran against Cheryl Mills for judicial office. During the campaign, Commissioner Golub filed a lawsuit against Cheryl Mills that was ultimately dismissed. Cheryl Mills subsequently filed a lawsuit against a person aligned with Commissioner Golub’s campaign. The masters aptly described the relationship between Judge Mills and Commissioner Golub as being “marked by strong, mutual antipathy.”
Judge Mills expected Commissioner Golub to recuse himself under Code of Civil Procedure section 170.1 from hearing a matter concerning the son of Judge Mills and Judge Cheryl Mills. However, the commissioner did not recuse himself and Judge Mills did not move to disqualify him.[4] Instead, *CJP Supp. 7 Judge Mills asked the commissioner to clarify whether the offense was a misdemeanor or infraction, and the commissioner explained that it was an infraction and accepted the son’s plea to the infraction. The son was ordered to complete 20 hours of volunteer work with the American Lung Association or the American Cancer Society and to submit proof of completion to the court.
Shortly after the March court appearance, the son entered a 10-month out-of-state residential rehabilitation program. Consequently, he did not complete the required volunteer work. In mid-September 2011, an order to show cause (OSC) why proof of community service had not been submitted was issued by the court, setting the matter for 1:30 p.m. on October 4, 2011, in Department 59. The son was still in the out-of-state program. Judge Mills and Judge Cheryl Mills discussed the OSC and agreed an attorney should appear for their son because Commissioner Golub would be handling the matter. Judge Mills asked Attorney Elle Falahat, a close friend, to appear on his son’s behalf and asked her to request that the community service requirement be satisfied through performance in the rehabilitation program. The judge explained that the therapeutic goal of volunteer work at the American Cancer Society or American Lung Association was served through his son’s participation in the rehabilitation program that included counseling related to smoking.
On the morning of the October 4, 2011 scheduled hearing, Judge Mills and Ms. Falahat spoke on the phone several times concerning her anticipated court appearance at 1:30 p.m. Judge Mills asked her to arrive early so he ‘could provide her with documents concerning his son’s participation in the rehabilitation program. At 10:21 a.m. Ms. Falahat called Judge Mills on his cell phone and told him she could not appear at the hearing because of an emergency. She told Judge Mills, “We have to continue it obviously.” According to Ms. Falahat, Judge Mills was “in a state of panic” and responded, “Let me see how I can handle this.” (Judge Mills testified he told Ms. Falahat, “Let me think about what I want to do, and then I’ll let you know.” He subsequently testified he said to her, “Well, I’ll figure out what we’re going to do.”) Judge Mills did not ask Ms. Falahat to call the clerk’s office to obtain a continuance and Ms. Falahat did not offer to do so.[5]
*CJP Supp. 8 According to Judge Mills’s clerk, Joane Quontamatteo, the judge was upset after Ms. Falahat informed him that she could not appear. Ms. Quontamatteo offered to go to Department 59 and inform Ms. Sims that the attorney could not appear and find out what needed to be done. Judge Mills told her he would take care of it himself because it was a personal matter.
Judge Mills went downstairs to seek out Ms. Sims, the clerk in Department 59. He encountered her in the main clerk’s office and informed her that neither his son nor the attorney engaged to represent him could attend the OSC hearing that afternoon. Judge Mills responded positively when Ms. Sims informed him that Commissioner Golub was not in that day and Helen Peters would be presiding in Department 59. He said something along the lines of “Well, great; that’s better.” Ms. Sims asked, “What is it on for?” The judge explained it was an order to show cause for proof of community service and the “lawyer was going to present the records from the program that [his son] is in and ask for credit for time served for the program that he’s doing in lieu of the community service.” Ms. Sims indicated that the pro tempore judge would want to review such documents to determine if the volunteer service obligation had been satisfied.
Judge Mills then went back to his chambers to retrieve the documents and brought them to Ms. Sims in the administration area of the courthouse. The documents included the parent handbook'for the program and invoices for payments to the program. Judge Mills showed the documents to Ms. Sims, but she declined to take them.
As Judge Mills was leaving the courthouse for lunch at around noon that day, he stopped by Ms. Sims’s office because he wanted to know “what was going to occur” and what they wanted him to do. Ms. Sims told the judge to come back when he returned from lunch.
Pro Tempore Judge Peters thought she arrived at the Walnut Creek courthouse between 12:30 p.m. and 1:00 p.m. on October 4, 2011. She testified Ms. Sims first told her Judge Mills’s son’s case was on calendar, an attorney would be appearing, and there was a question of whether the attorney could be given priority on the calendar. Sometime later, Ms. Sims came into chambers and told Ms. Peters the attorney was not available and Judge Mills needed to know whether he could take care of the matter before the start of his own calendar.
The windows in Department 59 chambers look directly into the judges’ parking area. Ms. Peters testified that she noticed Judge Mills’s car arrive shortly before the beginning of the afternoon calendar. The masters found that Ms. Peters knew an attorney would not be appearing for Judge Mills’s son *CJP Supp. 9 before she saw the judge arrive in the parking lot.[6] The masters concluded that this fact refutes Ms. Sims’s testimony that Judge Mills initially told her an attorney would appear and did not disclose that Ms. Falahat had a conflict until after he returned from lunch. The examiner urges the commission to reject this finding because Ms. Peters’s observation was based on a “flash” of a car outside the chambers window[7] and because such a scenario is inconsistent with Ms. Sims’s testimony on this issue.
We believe the evidence taken in its totality supports the masters’ finding that Ms. Peters knew an attorney would not be appearing when she saw Judge Mills enter the parking lot. On cross-examination, Ms. Peters testified, “I knew before Judge Mills’[s] vehicle flashed, if that’s what it was, that the lawyer was not going to be appearing. I knew that before he had entered the building that day.” And, two other times in her testimony Ms. Peters stated or suggested that she knew the lawyer would not be appearing before she saw the judge enter the parking lot.[8]
•Court security records reflect that Judge Mills returned from lunch at precisely 1:30:11 p.m. He immediately went to Ms. Sims’s office. Ms. Sims asked the judge to wait while she went to confer with Ms. Peters. In a matter of seconds, Ms. Sims returned and asked Judge Mills to come and talk to Ms. Peters.
Judge Mills and Ms. Sims entered the chambers of Department 59 where Ms. Peters was sitting behind the commissioner’s desk. Judge Mills and Ms. Peters greeted each other, and Judge Mills expressed pleasure or relief that she was there instead of Commissioner Golub. When Ms. Peters asked *CJP Supp. 10 what was going on in the case, Judge Mills told her the matter was on calendar for an OSC regarding failure to complete required volunteer work. The judge explained that his son was in an out-of-state program. According to Judge Mills, he then told Ms. Peters his attorney intended to ask for “credit for time served” in the program. According to Ms. Peters, Judge Mills himself asked for that disposition when he entered the chambers. The masters did not expressly resolve this conflict in the testimony because the “practical effect and legal consequences are no different whether Judge Mills himself asked for the disposition or told Ms. Peters the lawyer he engaged to represent [his son] had intended to ask for that disposition.” We agree.
Judge Mills said something to Ms. Peters like, “[D]o what you want.” Ms. Peters asked Judge Mills about the nature of the rehabilitation program but did not receive or review any documents. Judge Mills explained that his son was participating in outreach in the community while in the program. Ms. Peters concluded that participation in the program would qualify for the community service requirement. As they were leaving chambers, each to begin their own court calendars, Ms. Peters gave Judge Mills a hug.
In assessing her own actions, Ms. Peters testified, “I felt that I made the right decision in the wrong place.” The resulting disposition was within her discretion and in all likelihood would have been the same if an attorney had appeared in open court and made the request. When asked if she felt pressured to grant Judge Mills’s request because he was a judge, Ms. Peters replied, “Yeah. I did.”
Ms. Peters wrote “credit for time served, accepted” on the judge’s notes that Ms. Sims had retrieved from her office and brought into chambers. Ms. Sims made a similar notation on the clerk’s docket and minutes and also filled in “DAD” on the line for appearances. Judge Mills did not sign the stipulation for a pro tempore judge to hear the matter until the following day, October 5, 2011. However, Ms. Peters’s signature on the stipulation is dated October 4, 2011. Although all proceedings in Department 59 are recorded, neither party submitted any evidence of this matter having been recorded.
When Commissioner Golub returned to court on October 6, 2011, Ms. Sims told him about how Judge Mills’s son’s case was handled. The commissioner told Ms. Sims to contact the supervising judge at the Walnut Creek courthouse, which she did.
B. Conclusions of Law
While we give special weight and deference to the factual findings of the masters because they had the advantage of observing the demeanor of the *CJP Supp. 11 witnesses, legal conclusions of the masters are entitled to less deference because the commission has “expertise in evaluating judicial misconduct.” (Broadman, supra, 18 Cal.4th at p. 1090; see Freedman, supra, 49 Cal.4th CJP Supp. at p. 232.) For reasons explained below, we diverge from the masters in our legal conclusions.
There are three types of judicial misconduct: willful misconduct, prejudicial misconduct and improper action. Only the latter two are pertinent in this case.[9]
Prejudicial misconduct is the second most serious type of judicial misconduct. “Prejudicial conduct is distinguishable from willful misconduct in that a judge’s acts may constitute prejudicial conduct even if not committed in a judicial capacity, or, if committed in a judicial capacity, not committed in bad faith. Prejudicial conduct is ‘either “conduct which a judge undertakes in good faith but which nevertheless would appear to an objective observer to be not only unjudicial conduct but conduct prejudicial to public esteem for the judicial office” [citation] or “willful misconduct out of office, i.e., unjudicial conduct committed in bad faith by a judge not then acting in a judicial capacity.” [citation].’ [Citation.]” (Broadman, supra, 18 Cal.4th at pp. 1092-1093.) “The provision that the conduct must be that which ‘brings the judicial office into disrepute’ does not require actual notoriety, but only that the conduct, if known to an objective observer, would appear to be prejudicial to public esteem for the judicial office. [Citation.]” (Adams v. Commission on Judicial Performance (1995) 10 Cal.4th 866, 878 [42 Cal.Rptr.2d 606, 897 P.2d 544] (Adams).) “The subjective intent or motivation of the judge is not a significant factor in assessing whether prejudicial conduct has occurred under this standard. [Citation.]” (Ibid.)
The least serious type of misconduct is improper action. Improper action consists of unjudicial conduct that violates the Code of Judicial Ethics, but does not rise to the level of prejudicial misconduct because, viewed objectively, the conduct would not adversely affect the esteem in which the judiciary is held by members of the public. (Inquiry Concerning Ross (2005) 49 Cal.4th CJP Supp. 79, 89 (Ross); Adams, supra, 10 Cal.4th at pp. 897-899.)
The masters concluded that by discussing the case with Ms. Peters outside the courtroom and participating in a favorable disposition of the matter in *CJP Supp. 12 chambers, the judge created an appearance of impropriety in violation of canon 2 of the California Code of Judicial Ethics and engaged in improper action, but not prejudicial misconduct. Further, the masters concluded the judge’s communications with Ms. Sims did not constitute misconduct.
The examiner contends that Judge Mills engaged in prejudicial misconduct by meeting with Ms. Peters and in his interactions with Ms. Sims. In addition to violating California Code of Judicial Ethics, canon 2 (a judge shall avoid impropriety and the appearance of impropriety in all the judge’s activities), the examiner contends that Judge Mills violated California Code of Judicial Ethics, canons 1 (a judge is required to observe high standards of conduct so that the integrity and independence of the judiciary is preserved),[10] 2A (a judge shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary), and 2B(2) (a judge shall not lend the prestige of judicial office to advance the personal interests of the judge or others).[11]
Judge Mills urges the commission to reject the masters’ legal conclusion that he engaged in misconduct. He maintains in his written brief to the commission that “[tjhere was absolutely nothing improper” about his conduct and that he “acted as any concerned parent would in his situation and used the proper channels available to him after he was notified that his son’s attorney could not make the 1:30 [p.m.] appearance.”
We conclude that Judge Mills engaged in prejudicial misconduct by conveying his desired disposition of his son’s case to Ms. Sims and Ms. Peters through channels not available to the public. His conduct falls within the category of prejudicial misconduct arising out of conduct, which, even if not done in bad faith, would appear to an objective observer to be conduct prejudicial to public esteem for the judicial office. (Broadman, supra, 18 Cal.4th at p. 1092; Inquiry Concerning Hall (2006) 49 Cal.4th CJP Supp. 146, 154.) Further, through his communications with Ms. Sims and Ms. Peters, Judge Mills used the prestige of his judicial office to influence the disposition of his son’s case in violation of canon 2B(2), and created an appearance of impropriety and compromised the integrity and impartiality of the judiciary in violation of canons 1, 2, and 2A. (See Inquiry Concerning Platt (2002) 48 *CJP Supp. 13 Cal.4th CJP Supp. 227, 244-246 (Platt); Censure of Judge Sarmiento (2012) No. 191 at p. 6 (Sarmiento).)
When Judge Mills learned the attorney could not appear, he could properly have asked the attorney to seek a continuance, appeared himself at the scheduled hearing, or called the clerk to ask for another date. These are all courses of action available to members of the public faced with a similar situation. Instead, he went beyond what was necessary to inform Ms. Sims of the status of the case and bypassed normal procedures—he approached Ms. Sims in an area not accessible to the public, told her not just that his attorney could not appear but also of his desired resolution, and showed her documents in support of his request. By so doing, he created the appearance that he was using Ms. Sims as a conduit to the assigned judicial officer on behalf of his family member. He also discussed the matter with Ms. Peters in her chambers and off the record before the start of the afternoon calendar.
The masters summarized Judge Mills’s actions accordingly: “Although aware he was about to enter an ethical minefield, he elected not to follow the safest path and simply notify the clerk’s office of the situation and request a continuance.” The path he chose created the appearance that he obtained special access to the court clerk and the pro tempore judge and was able to bypass ordinary procedures by virtue of his position as a judge to the benefit of his son and his own schedule. The case was heard before the start of the calendar to accommodate Judge Mills’s need to start his own court calendar on time. When asked to describe the judge’s demeanor, Ms. Peters replied, “We were in a hurry. It felt like it was a stop along the way, an inconvenience, something to be done quickly and be finished.” Members of the public are required to take time off of work to come to court and do not have the advantage of having their case called before the start of the calendar and off the record to accommodate their work schedule and do not have special access to the judge’s clerk in nonpublic areas of the courthouse to provide documentation and arguments in support of their desired disposition. Further, Judge Mills was allowed to discuss the sensitive nature of his son’s situation in chambers without going through the same process expected of members of the public who request that their matter be heard in closed session. The commission has condemned conduct that creates the appearance of a “two-track system of justice—one for those with special access to the judge, and the other for everyone else. The nub of the problem is the appearance or reality that Lady Justice is not blindfolded.” (Inquiry Concerning Wasilenko (2005) 49 Cal.4th CJP Supp. 26, 51.)
The masters concluded that an objective observer aware of all the facts would not consider Judge Mills’s actions prejudicial to public esteem for the judicial office because the difference between what actually occurred and *CJP Supp. 14 what Judge Mills could properly have done is slight and because the same result would likely have occurred had the judge appeared in court. Whether or not his son received an unusually lenient disposition as a result of Judge Mills’s actions is not a determinative factor in our analysis of the level of misconduct. Regardless of the final disposition, judges must be sensitive to the appearance of impropriety inherent in discussing a family member’s court case with the judicial officer presiding over the matter behind closed doors and off the record. It leads to suspicions of favoritism and backdoor deals for the select few with connections to the judicial officer hearing the matter.
The fact that Ms. Sims and Ms. Peters are subordinate to Judge Mills magnifies the appearance of impropriety and further undermines public confidence in the integrity of the judiciary. Judge Mills maintains he did not take advantage of his judicial position because he was acting in the role of a father, not a judge, and emphasizes that he told Ms. Peters to do what she wanted. However, Ms. Peters testified that she felt pressured to grant Judge Mills’s request because he was a judge. It is not surprising that a person in a subordinate position to the judge would feel pressure to comply with a judge’s request. For this reason, the canons prohibit a judge from seeking civic or charitable contributions from a subordinate judicial officer or temporary judge, while permitting such solicitation among judges. (Cal. Code Jud. Ethics, canon 4C(3)(d)(i); see Rothman, Cal. Judicial Conduct Handbook, supra, § 10.43, p. 557.) As a judge for 16 years, the ethical boundaries between judges and their subordinates should have been apparent to Judge Mills.
In Platt, supra, 48 Cal.4th CJP Supp. at pp. 244-246, the judge called a court commissioner, asked her questions about a traffic ticket issued to the judge’s godfather, and conveyed information that his godfather was active in the community. The commission noted that even though the facts showed Judge Platt did not ask that any action be taken and that the commissioner was not influenced by the judge’s call, it did not mean the commissioner did not perceive the call as an attempt to influence. The commission observed: “The attempt to influence is inherent in the unsolicited telephone call and the ex parte conveyance of positive information about the offender. The judge’s failure to explicitly ask the referee to do anything does not change the nature of the communication.” (Id. at p. 245.)
Judge Mills also suggests that he was simply following the directives of Ms. Sims and Ms. Peters. However, as a judge, he was responsible for ensuring that his son’s case was handled no differently than any other matter before the court and that he was not granted procedural shortcuts because of his judicial position, particularly when dealing with those who are subordinate to him.
*CJP Supp. 15 HI
DISCIPLINE
In determining the appropriate level of discipline, we consider several factors, including the following: number of incidents of misconduct, the seriousness of the misconduct, whether the judge has prior discipline, whether the judge acknowledges and appreciates the impropriety of his actions, the impact of the misconduct on the judicial system, and the judge’s reputation for administering his or her duties in a fair, impartial, and dignified manner. (Policy Declarations of Com. on Jud. Performance, policy 7.1 [nonexclusive factors relevant to sanctions]; e.g., Ross, supra, 49 Cal.4th CJP Supp. at p. 138.)
Weighing heavily in aggravation is Judge Mills’s history of prior discipline. This is not the first time Judge Mills has been disciplined for using his judicial position to bypass proper channels on behalf of his son. In 2011, he received an advisory letter for, after signing a search warrant, allowing his son to accompany a police officer in executing the warrant without going through the ordinary application process for going on a ride-along.
In addition, Judge Mills received an advisory letter in 2008 for improperly conditioning a defendant’s release in a misdemeanor probation revocation proceeding on posting bail for the improper purpose of collecting restitution. In 2006, he was publicly admonished for engaging in improper ex parte discussions and for a pattern of making discourteous, sarcastic, and demeaning comments to attorneys and litigants appearing before him. And, in 2001, he received a private admonishment for remarks suggesting a lack of impartiality and attempting to obtain a guilty plea from a defendant despite statements from the defendant indicating he wanted counsel.
Another aggravating factor is Judge Mills’s failure to acknowledge or appreciate the impropriety of his actions. At the hearing before the special masters and in his briefs to the commission, he insisted that he did nothing improper. During his oral argument before the commission, Judge Mills stated that, in hindsight, he realizes he should not have met with the pro tempore judge in chambers. However, he immediately followed this acknowledgement with excuses and justifications for his conduct. The judge also deflected questions about the public perception of his actions by questioning Ms. Sims’s credibility and recollection of the time events occurred. His presentation before the commission leaves us with no confidence that he appreciates the impropriety of his actions.
“A judge’s failure to appreciate or admit to the impropriety of his or her acts indicates a lack of capacity to reform.” (Platt, supra, 48 Cal.4th CJP *CJP Supp. 16 Supp. at p. 248; see Fletcher v. Commission on Judicial Performance (1998) 19 Cal.4th 865, 920-921 [81 Cal.Rptr.2d 58, 968 P.2d 958]; Kloepfer v. Commission on Judicial Performance (1989) 49 Cal.3d 826, 866 [264 Cal.Rptr. 100, 782 P.2d 239].) The fact that Judge Mills was advised by the commission in February 2011 that it is improper to use his judicial position to bypass normal procedures for the benefit of a family member makes his failure to recognize the impropriety of his actions in October 2011 all the more troubling. (See Inquiry Concerning Van Voorhis (2003) 48 Cal.4th CJP Supp. 257, 301-302; Doan v. Commission on Judicial Performance (1995) 11 Cal.4th 294, 339-340 [45 Cal.Rptr.2d 254, 902 P.2d 272]; McCullough v. Commission on Judicial Performance (1989) 49 Cal.3d 186, 199 [260 Cal.Rptr. 557, 776 P.2d 259] [failure to respond to prior discipline “evidences a lack of regard for the Commission, [the Supreme Court] and his obligations as a judge”].)
Judge Mills’s misconduct is further aggravated by the fact that Ms. Sims and Ms. Peters were his subordinates. The judge’s conduct and his subsequent response to the charges evidence a lack of sensitivity to the pressure he implicitly placed on them by virtue of his judicial position. (See Sarmiento, supra, No. 191 at p. 7.)
We have already discussed the adverse impact of Judge Mills’s conduct on public confidence in the impartiality of the judicial system, which is another important factor in our assessment of the appropriate sanction. In imposing public discipline, we assure the public that using the influence of judicial office to obtain an advantage, no matter how slight, in a legal matter involving a family member or friend is impermissible.
In determining to issue a public admonishment, rather than a higher level of discipline, we take into consideration that Judge Mills did not overtly pressure Ms. Sims or Ms. Peters to facilitate the meeting in chambers and told Ms. Peters to do what she wanted or words to that effect, and the requested disposition was not more lenient than would likely have occurred if the attorney had appeared in open court on behalf of the judge’s son.[12] We also consider in mitigation the masters’ finding that Judge Mills was acting as *CJP Supp. 17 a concerned parent and the testimony of a number of character witnesses that the judge is hardworking, conscientious, and fair.[13]
Balancing the foregoing factors leads us to the conclusion that a public admonishment is the appropriate sanction.
IV
ORDER
Pursuant to the provisions of article VI, section 18 of the California Constitution, we hereby impose this public admonishment.
Commission members Mr. Lawrence J. Simi, Hon. Erica R. Yew, Ms. Mary Lou Aranguren, Anthony P. Capozzi, Esq., Nanci E. Nishimura, Esq., Hon. Ignazio J. Ruvolo, Mr. Richard Simpson, Ms. Maya Dillard Smith, Ms. Sandra Talcott, and Mr. Adam N. Torres voted in favor of all of the findings and conclusions expressed herein and in the foregoing order of a public admonishment. Commission member Hon. Thomas M. Maddock was recused.

 On January 29, 2013, Judge Mills filed a motion with the special masters to dismiss these proceedings, contending that the allegations as charged did not constitute judicial misconduct. The special masters declined to rule on the motion as beyond their purview. (See Rules of Com. on Jud. Performance, rules 119(a), 121(b).)

 A pro tempore judge is an attorney who serves as a temporary judge once, sporadically, or regularly on a part-time basis by appointment of the superior court. (See Cal. Code Jud. Ethics, Terminology.)

 We refer to respondent Judge Bruce Clayton Mills as Judge Mills throughout this decision. We refer to his former wife, Judge Cheryl Mills, by both her first and last names.

 See Rothman, California Judicial Conduct Handbook (3d ed. 2007) section 7.52, page 358 (“Where the party, victim or defendant is a fellow judge or a spouse of a fellow judge, there would at least be a perception of bias, or a reasonable doubt that any judge on the same court would be able to maintain impartiality.”); California Judges Association, Formal Ethics Opinion No. 56 (2006) Ethical Considerations When a Judge or a Member of a Judge’s Family *CJP Supp. 7 Has Been Arrested or Is Being Prosecuted for Criminal Activity, page 2 (“If the arrest occurs within the jurisdiction of the judge’s court, it is recommended that the judge notify the Presiding Judge, so that the case may be assigned to a judge whose impartiality will not be questioned.”)

 The masters found Ms. Falahat’s failure to offer to contact the court to seek a continuance to be a mitigating factor on Judge Mills’s behalf. We do not consider this fact to be mitigating because Judge Mills told Ms. Falahat that he would let her know once he decided how he wanted to proceed.

 The masters accepted Ms. Peters’s testimony that Ms. Sims initially told her an attorney would be appearing for Judge Mills’s son and asked that the matter be given priority on the calendar. However, the masters found that there was not clear and convincing evidence that Judge Mills actually told Ms. Sims that an attorney would be appearing or asked for priority. We have difficulty understanding why Ms. Sims would convey this information to Ms. Peters if Judge Mills had not reported it to her. Nevertheless, we defer to the masters’ finding that the examiner did not prove this allegation by clear and convincing evidence based on the masters’ credibility determinations and inconsistencies and conflicts in the evidence with respect to when Judge Mills allegedly made this statement to Ms. Sims.

 When asked on direct examination if she saw Judge Mills park his car, Ms. Peters replied, “I wasn’t really watching. I was just in chambers and it’s a view directly outside my window. So I didn’t look and say, ‘Oh, there’s Judge Mills; he [sic] parking.’ I just looked up and saw a flash .... And I said, ‘Oh, that’s Judge Mills.’ ”

 “Q. [Mr. Murphy] So before you saw Judge Mills pull into the parking spot and get out of his car, you knew that the lawyer now could not attend the hearing; right? Q] A. [Ms. Peters] I believe so, yes.” Ms. Peters later testified that when she saw Judge Mills pull into the parking lot, “It was my expectation that he would be entering my chambers in order to dispose of [his son’s case], yes.” She also testified that she knew a lawyer would not be appearing before Ms. Sims came into chambers to tell her the judge had returned from lunch.

 Willful misconduct, the most serious type of judicial misconduct, is defined by the Supreme Court as unjudicial conduct committed in bad faith by a judge acting in his or her judicial capacity. (Broadman, supra, 18 Cal.4th at p. 1091.) Although the Notice charges Judge Mills with willful misconduct, the examiner did not argue before the masters or the commission that the judge engaged in willful misconduct.

 The California Code of Judicial Ethics was amended effective January 1, 2013. Canon 1 was amended to add the word “impartial,” so that it now reads, “An independent, impartial, and honorable judiciary is indispensable to justice in our society.” The amendments are not applicable in this case because they were not in effect at the time of the charged conduct.

 The Notice also charges Judge Mills with a violation of canon 3B(7), which prohibits a judge from engaging in or considering ex parte communications. The masters concluded Judge Mills did not violate this canon because no party other than his son was involved in the hearing, and the evidence established that the district attorney’s office has a policy of not appearing on the calendar at issue in this case. The examiner does not object to this conclusion. We adopt the conclusion of the masters.

 Judge Salvador Sarmiento was censured pursuant to a stipulation in 2012 for communications with a commissioner in nonpublic areas of the courthouse concerning his wife’s traffic ticket. While there are factual similarities with the present case, Judge Sarmiento’s conduct was more aggravated. He approached the commissioner in the courthouse hallway and followed her into her chambers where he asked her to address his wife’s $300 penalty assessment fee and left the ticket on the commissioner’s desk. The judge admitted he was seeking to have the commissioner vacate the fine—something that would not necessarily occur through proper channels. Moreover, he returned to the commissioner’s chambers later that day and told her nothing had been done on the ticket. The commissioner told the judge she would give him a trial date, but did not vacate the fee.

 The character witnesses testifying on Judge Mills’s behalf were a retired Contra Costa County Superior Court judge, a Contra Costa County Superior Court commissioner, the Contra Costa County District Attorney, five private attorneys, and one retired senior deputy district attorney. One of the attorney witnesses was the attorney who participated in ex parte communications with Judge Mills in the matter that resulted in the judge’s 2006 public admonishment.